## WHEELING.

WAMSLEY *v.* STALNAKER.

Submitted January 28, 1884—Decided April 26, 1884.

(*WOODS, JUDGE, Absent.)

1. In this State equity will enjoin the collection of purchase-money of land on the ground of default of title, after the vendee has taken possession under conveyance from the vendor with general warranty, if the title is questioned by a suit either prosecuted or threatened, or if the purchaser can show clearly that the title is defective. (p. 223.)

*Counsel below.

2. But the interposition of a court of equity by injunction will not
   be extended further than it has been already extended by the
   decisions binding on this Court, which have been rendered by
   the court of appeals of Virginia prior to the formation of this
   State or by this Court, unless peculiar grounds of equitable
   interference exist, such as the insolvency of the grantor or his
   fraudulent conduct, which renders such interposition neces-
   sary in order to prevent irreparable damage to the vendee.
   (p. 223.)

3. When the vendor by his deed "covenants with the vendee for
   general warranty of title, and that he is seized of the land con-
   veyed in fee simple, and has good right and title to convey the
   same, and that the same shall not be subject to any liability
   from incumbrances now thereon," and there are recorded judg-
   ment-liens on the land at the time of the conveyance, a court of
   equity will not enjoin or stay the collection of a judgment
   against the vendee for the purchase-money of the land, unless
   the bill shows, that the vendor has no other lands sufficient to
   satisfy such judgment-liens, and that he is unable to pay them
   because of his pecuniary condition.   (p. 225.)

GREEN, JUDGE, furnishes the following statement of the
case :

Jacob S. Wamsley filed his bill at the December rules,
1880, in the circuit court of Randolph county, in which he
alleged, that on the 7th of February, 1877, Jacob H. Arbo-
gast and his wife conveyed to him two thousand acres of
land in Pocahontas county, West Virginia, with general
warranty of title; and in the deed he covenanted, that he
was seized of the said tract of land and had good right and
title to convey the same, "and that the same shall not be
subject to any liability from incumbrances thereon except
for the vendor's lien in favor of Jacob H. Arbogast, which
is hereby expressly reserved." The deed is filed with the
bill as an exhibit and has been properly executed and acknowl-
edged by the grantors and duly recorded, but the amount
of the purchase-money unpaid, for which this vendor's lien
is reserved, nowhere appears on the face of this deed.    The
bill states that the price of this land was one thousand five
hundred dollars, of which the plaintiff paid only fifty dollars.
The balance was payable in instalments with interest from
the date of sale, and no part of it having been paid, and
Arbogast having on October 3, 1877, assigned all the pur-

chase-money-bonds to one Stalnaker, he on May 15, 1880, instituted a suit in the circuit court of Randolph county for the whole of this purchase-money, in the name of Arbogast for the use of Stalnaker, and recovered judgment thereon against him, Wamsley, for one thousand seven hundred and sixty-five dollars and thirty-seven cents, with interest thereon from the date of said judgment, May 15, 1880, and twelve dollars and five cents costs; on which judgment a *fieri facias* issued on May 31, 1880, which was placed in the hands of the sheriff of Randolph county, who levied the same on his, Wamsley's, goods and chattels which were about to be sold to satisfy this execution. The complainant in this bill alleges, that there were a number judgments, which were liens and charges upon this land, when conveyed to him as aforesaid, and he specifies them in detail and files with the bill copies thereof exceeding in amount of the judgment against him; and he says these judgments are unpaid and are still existing liens. The plaintiff in this bill prays that Jacob H. Arbogast and Hamilton Stalnaker, the defendant, be forever restrained and enjoined from collecting said judgment; that the various liens against the lands of Jacob H. Arbogast be ascertained and reported according to their order and priorities; and for general relief. The injunction prayed for was awarded on September 27, 1880, by the judge of the sixth circuit of the State of West Virginia in vacation, and the injunction-bond required was duly executed.

On September 12, 1881, Jacob H. Arbogast filed his answer. He states, that the purchase-money-bonds due from the plaintiff to him were assigned by him to Hamilton Stalnaker to pay a judgment in favor of Hamilton Stalnaker against him for one thousand dollars with interest from the 27th day of April, 1873, and costs, seventeen dollars and thirteen cents, which constituted much the largest judgment-lien on this land, and was the one named in the bill. These bonds of the said plaintiff to him Arbogast so assigned to his co-defendant, Stalnaker, paid off this judgment against Arbogast, and left about three hundred dollars coming to him, Arbogast, out of this judgment against the plaintiff. The answer then proceeds to state the judgment-liens on his land, and alleges what has been paid on them severally, and which

of them have been paid off in full, and says the plaintiff can remove this lien in favor of his co-defendant for the one thousand dollars and interest and costs by applying the money due on the judgment against him to its payment, as it was understood it should be so applied; that the other judgment liens amount to a mere trifle, while he has or did have lands, on which these small judgments are liens, and which must be first subjected to pay them, amounting in value to not less than eleven thousand dollars. The respondent further alleges, that this injunction was procured simply for delay, and asks that it may be dissolved and the bill dismissed at plaintiff's costs.

A motion was made immediately after this answer to dissolve this injunction, but the court refused to dissolve it then deeming it proper to give to the plaintiff further time to prove his case. Subsequently after the depositions were taken on January 11, 1882, the court again declined to dissolve this injunction, and referred the cause to a commissioner to ascertain the amounts, character and priority of the liens on this tract of two thousand acres, which might remain unsatisfied and to whom due. Depositions of R. F. Dennis, J. H. Arbogast, the defendant, and John C. McLaughlin were taken by the plaintiff and substantially prove the allegations of the answer. The bill was taken for confessed as to the defendant, Stalnaker. The commissioner made his report September —, 1882, the contents of which sufficiently appear from the final decree made September 30, 1882, and which was as follows:

"This cause came on again this day to be further heard upon the papers formerly read, and on the motion of the defendants to dissolve the injunction heretofore awarded in this cause, and upon the report of Commissioner Jones, to which there are no exceptions, and was argued by counsel. On consideration whereof, it is adjudged, ordered and decreed that said report be confirmed; and it appearing to the court that the plaintiff, Jacob S. Wamsley, is indebted by reason of a judgment heretofore obtained against him, being the judgment mentioned and described in the plaintiff's bill, as of date May 15, 1880, to the defendant, Hamilton Stalnaker, in the sum of two thousand one hundred and

thirty-six dollars and twenty-six cents, including interest and damages, with interest thereon from the 21st day of September, 1882, till paid, it is therefore adjudged, ordered and decreed that the defendant, Hamilton Stalnaker, recover of the plaintiff, Jacob S. Wamsley, the said sum of two thousand one hundred and thirty-six dollars and twenty-six cents, with interest thereon from the 21st day of September, 1882, till paid, which is the amount in full of the judgment enjoined, with interest and damages, as shown by statement 'X' filed and and adopted by the court, and the costs of the defendant in this suit, including an attorney's fee to be taxed therein of twenty dollars. It further appearing to the court that the debt set forth in the bill as due Edgar Campbell has been paid off and discharged by Jacob H. Arbogast, and that the judgment of C. A. Hull, for S. L. Gibson, also set forth therein, has been released in so far as it affects in any way the land sold by J. H. Arbogast to J. S. Wamsley, and that the priority of the other liens in said bill mentioned is as follows, viz:

"Class 1. A judgment in favor of J. H. Kindig and Peter Wein for thirty-seven dollars and sixty-five cents, with interest thereon from the 12th day of June, 1872, till paid, and eight dollars and ninety cents, aggregating, with interest to September 14, 1872, as shown by said commissioner's report, the sum of sixty-nine dollars and seventy-two cents.

"Class 2d. A judgment in favor of Hamilton Stalnaker for one thousand dollars, with interest thereon from the 23d day of April, 1873, till paid, seventeen dollars and thirteen cents costs, aggregating, with interest to September 14, 1872, as shown by said commissioner's report, the sum of one thousand five hundred and eighty dollars and eighty cents.

"Class 3d. A judgment in favor of J. H. Kindig and P. Wein for one thousand four hundred and seventeen dollars and sixty-four cents, with interest thereon from the 2d day of October, 1873, till paid, and twenty-two dollars and ninety-two cents costs, aggregating, with interest to September 14, 1872, as shown by said commissioner's report, the sum of two thousand two hundred and one dollars and thirty-six cents.

"It further appearing to the court that the amount herein-

before decreed to Hamilton Stalnaker is purchase-money on a tract of two thousand acaes of land purchased by Jacob S. Wamsley from Jacob H. Arbogast, and that said Wamsley has a right to have the said purchase-money applied in the extinguishment of the liens existing upon said land, it is further adjudged, ordered and decreed that the defendant, Hamilton Stalnaker, when he shall have collected the said debt aforesaid, pay the judgment of the first class, as before set forth, due J. H. Kindig and P. Wein, then he shall retain out of said money sufficient to discharge the second class judgment found due himself, as before set forth, and whatever amount remains thereafter he shall pay to J. H. Kindig and P. Wein upon third class debt in their favor as ascertained in this decree, and any surplus remaining thereafter he shall pay to the detendant, Jacob H. Arbogast; and upon the payment of the liens aforesaid, the parties holding the said liens shall execute and deliver to the plaintiff, Wamsley, releases, duly executed, for recordation, and if they fail so to do, then E. Tilberry Jones, who is hereby appointed a special commissioner for the purpose, shall execute for the said leinors releases of the liens aforesaid in so far as they affect the two thousand acres of land mentioned in this suit, at the costs of said leinors.    It is further ordered that the injunction awarded in this cause be dissolved, with costs and damages to the defendants as hereinbefore ascertained, and that unless the said Jacob S. Wamsley, or some one for him, shall, within ten days from the rising of this court, pay off and discharge the debt, interest and costs hereinbefore decreed, then the clerk of this court is authorized to issue a writ of *fieri facias* for said sum, directed to the sheriff of this county, 'endorsed no security can be taken.' And this cause is placed among the causes ended."

The following is a copy of statement 'X' as referred to in the final decree:

"STATEMENT X.

"JACOB S. WAMSLEY  
vs.                                                    } In Chancery.  
"HAMILTON STALNAKER and JACOB H. ARBOGAST.

"Judgment in favor of H. Stalnaker, rendered May 15, 1880.................................................................$1,765 37

| | |
|---|---|
| Int. at 6 per cent. from date to date of injunction-bond ...................... ...................................................... | 42 36 |
| Sept. 21, 1882.—Int. at 10 per cent. from date of injunction to this date...................... ....... ........ | 328 53 |
| Am't to be decreed Sept. 21, 1882............................ | $2,136 26 |

"Time from date of judgment to date of injunction-bond, four months and twenty-four days.

"Time from date of injunction-bond being filed to this date, one year, ten months and — days."

From this decree Jacob S. Wamsley has obtained an appeal and *supersedeas*.

*Caleb Boggess*, for appellant.

*A. F. Haymond* and *J. J. Davis* for appellees.

Green, Judge:

The questions involved in this cause can be much better disposed of after we have taken a general view of the law with reference to the jurisdiction of a court of equity to enjoin or stay the collection of the purchase-money of a tract of land by the vendor, when there are covenants of warranty, of good right to convey, against incumbrances, and other usual covenants, where the vendor has no title to the land or a part thereof, or when the land is encumbered by judgment or other liens. If we were not bound by precedents we should consider, that the correct principles were laid down in the following language taken from Judge Tucker's opinion in *Beale* v. *Seiveley et al.*, 8 Leigh 673:

"It may happen however that the vendee will not take the hazard of the title. The vendor on his part may be willing to assure it to a certain extent but no further. He may be very willing to encounter the hazard of *eviction* taking the chances of his title being strengthened in its weak points by lapse of time, before a superior title is enforced. He may therefore be willing to give a general warranty, which cannot be enforced until eviction, but not a covenant for good title which he may not have, and which covenant would of course be broken the instant it is entered into, if his title be defective. * * * * When he enters into a general warranty without other covenants, he makes himself only responsible for

eviction, and secures to himself the advantage of every doubt which hung over his title being removed by lapse of time. In these cases therefore the vendee is confined to the covenant of general warranty. He has chosen, or at least has agreed upon, his remedy, and to that remedy he must be tied down. However bad his title, he cannot sue upon his warranty unless he be evicted; and if he can not do so at law, upon what principle can equity make the vendor liable beyond the terms of his contract? A contract without other covenants than a warranty, is in effect an agreement between vendor and vendee, that the vendor is never to be responsible nutil the vendee is turned out by superior title. How can equity make him responsible further? 'It can not mend men's bargains, though it sometimes mends their assurances.' *Per Lord Nottingham* in *Maynard* v. *Mosely*, 3 Swanst. 651. It can not do so without making a new contract for the parties or interpolating a new and substantive principle into that already made. Accordingly it is the established principle in courts of equity in England, that if the conveyance has been actually executed, the purchaser can obtain no relief against the payment of the purchase-money. He must look to his covenants; he has contracted for his remedy, and to that remedy he must resort. He has no right, I take it, after such a purchase with warranty, to call for the title of his vendor, to sift it to the very bran, and enjoin or recover back the purchase-money upon its supposed defects. See *Urmiston* v. *Pate*, 4 Cruise's Dig. Tit. 32, ch. 25, § 90, p. 420; Sugden on Vendors, 558. So far from it that if he knew of the defects and did not provide against them he is without remedy. Co. Litt. 384, Butler's note. For if there be no covenants for good title, it is, as I have said, equivalent to the deduction that the vendor is not to be responsible for the *defect* of title but only for *eviction*. Were it otherwise an inducement would be held out to the vendee to hunt up defects and expose flaws in a title, which but for his intermeddling, might in a few years have been removed and repaired by time; and thus he would be converted from an ally into an enemy and a spy, engaged industriously in sapping the foundations of his vendor's title, instead of supporting and strengthening it, as he is bound to do upon every principle

of equity and good faith. Possessed of the title papers and (if the vendor has acted fairly) possessed also of all his secrets; fully informed of all the weak points of the title, he makes the confidence reposed in him the means of betrayal, and seeks to get rid of a disadvantageous bargain by treachery towards one whom the law considers as conjunct in interest with himself, and from whom it rigorously enforces a disclosure of all the facts in relation to the subject of the contract."

Such, I take it are the considerations in part, which sustain the rule of the courts of England. To that rule there has recently been admitted an exception. Where the seller is aware of a fact from which a defect of title arises and *which the vendee had no means of knowing*, the purchaser may either maintain an action at law for the deceit, or have a rescission of the contract itself by an appeal to a court of equity. Such is the principle laid down in *Edwards* v. *McLeay*; Cooper's Chancery Cas. 308 as modified by Lord Eldon on an appeal in same case; 2 Swanst. 287; see also Sugden on Vendors 565; Co. Litt 384; A. Butler's notes, *ad finem*. The same principle has been followed in the courts of New York. *Abbott* v. *Allen*, 2 Johns. Chy. 519.

These principles thus stated by Judge Tucker I would be disposed to adopt, if I did not feel constrained to depart from them by the decisions in Virginia both prior and subsequent to the rendition of this opinion, and also by the decisions in West Virginia. Judge Tucker admits, that these principles have been departed from in Virginia. He says on this subject, p. 675 : " With us it cannot be denied that the practice has been more lax. But even with us relief is only given to a purchaser who has obtained his deed, when there has been an actual eviction, or where a suit is depending or threatened, or when the vendee placing himself in the attitude of the superior claimant can show a clear outstanding title or incumbrance. *Ralston* v. *Miller*, 3 Rand. 44; *Yancey* v. *Lewis*, 4 H. & M. 390; *Grantland* v. *Wight*, 5 Munf. 295; *Koger et al* v. *Kane's Adm'r*, 5 Leigh 606; *Richards* v. *Mercer*, 1 Leigh 125. * * * But notwithstanding these relaxations I am aware of no case in which the rights of the party have been extended in equity beyond his covenants."

In my judgment this conclusion drawn by Judge Tucker from this and other Virginia cases is inaccurate, and "the rights of the vendee have by the decisions both in Virginia and in West Virginia in numerous cases been extended in equity beyond the covenants he has taken for his protection." But I must say I am indisposed to extend these rights of the vendee in equity, any further than I am compelled to do by the decided cases, which are binding authorities on us or beyond such cases as come clearly within the meaning on which these cases must have been based. We will not enquire how far these Virginia and West Virginia cases have really extended the rights of the vendee in a court of equity beyond the covenants which he had taken for his protection. They have generally been cases in which there was only a covenant of general warranty, and in *Ralston* v. *Miller*, 3 Rand. 49, Judge Green in delivering the opinion of the court says: "This court has in favor of purchasers gone far beyond every thing which has been sanctioned by the court of chancery in England or elswhere, in enjoining the payment of the purchase-money after the purchaser had taken possession, under a conveyence, especially in the general warranty. Yet it has never gone so far as to interfere, unless the title was questioned by a suit, either prosecuted or threatened, or unless the purchaser could show clearly, that the title was defective." This is the view, which according to my understanding of the case, has been followed in Virginia and West Virginia, when the vendee was protected by a warranty of title and had not been evicted. I need not here review the cases but will refer to a few of the more recent ones to show that this view has prevailed both in Virginia and West Virginia since the opinion of Judge Tucker which we have quoted was delivered, in which views not in accord with these decisions were expressed: views which in my judgment were sound and would be adopted if we were not controlled by these Virginia and West Virginia decisions.

In *Clarke* v. *Hardgrove*, 7 Gratt. 399, it was held, that as the appellant has clearly shown, that at the institution of his suit the title to a portion of the land conveyed to him was defective, he had a right, notwithstanding a deed with general warranty had been made, to enjoin the collection of

the purchase-money. See *Koger* v. *Kane,* 5 Leigh 606, and cases there cited. * * * * It not being incumbent upon the purchaser in case of such clear defect of title to risk the hazard of the vendor's solvency." This case was approved by this Court in *Renick* v. *Renick et al.,* 5 W. Va. 291. It is true, that a still greater liberality has prevailed in enjoining proceedings under deeds of trust. *Gay* v. *Hancock,* 1 Ran. 72; *Lane* v. *Tidball,* Gilmer, 130. But this rests on peculiar principles not necessary to be now pointed out. The distinction is adverted to by Judge Cabell in *Miller* v. *Argyle, Ex'r,* 5 Leigh 460. In the case of *Koger* v. *Kane,* 5 Leigh 608, Judge Tucker bases this right of a court of equity to enjoin the purchase-money, though there is a general warranty-deed held by the purchaser, if the title is clearly shown to be defective, partly on the ground that on the general warranty the vendee could not sue at law till he was evicted, and seemed to regard it as doubtful whether such relief in equity would be given, if in the deed there were other covenants, which could be sued upon at law before eviction, as for instance, a covenant for good title; but this point was not decided nor do I know of its decision in any case in Virginia or in West Virginia. It would seem therefore, that the extension of the right of a court of equity to enjoin the collection of the purchase-money by the vendor because of defect of title, however clear, might perhaps be confined to the case, when there was no other covenant but the covenant of warranty, and might not be recognized, when there were also covenants, on which the vendee could sue at any time at law, such as covenants of good title. Of course in any case such an injunction might be had when there were equitable grounds, which would be applicable in a court of equity, when a contract of any sort was being enforced at law, and the opposite party could have no effective relief at law, such for instance, as when the vendor was insolvent and was enforcing a judgment obtained at law though he had no good title, and there was in the deed any covenants to make good the title or there was a covenant of warranty only. So jurisdiction of a court of equity to prevent the collection of this money in any such case might well arise from fraudulent or deceitful conduct on the part of the vendor.

The suppression by the vendor of a knowledge of fatal defects in his title would constitute no doubt such a fraud, as would authorize a court of equity to enjoin the collection of the purchase-money, especially if the vendor was insolvent and could not make good his covenants of title. But on the principles we have laid down mere outstanding encumbrance would not warrant a court of equity in enjoining the collection of the purchase-money of a purchaser in peaceable possession, though there were in the deeds covenants of warranty or covenants that the vendor had good title and right to convey, unless the vendor, who was enforcing the payment of the purchase-money, was insolvent or had been guilty of some fraud on the vendee in making the sale and conveyance. For in such case the vendee has not only not been evicted but there is no pending or threatened suit nor can it be shown, that his title is clearly defective, and some of these conditions must exist before according to the liberal practice in this State and in Virginia, any such injunction can be had except on such equitable grounds as the insolvency of the vendor or his fraudulent conduct or other special equities. See *Collins* v. *Clayton*, 53 Ga. 649.

But the decisions in reference to when a court of equity will enjoin the payment of purchase-money due the vendor in the different States are very conflicting, and High in his work on Injunctions, sec. 382, says very properly: "It is exceedingly difficult, if not impossible, by any process of generalization to deduce from the decided cases principles of general application which shall serve as rules for the guidance of courts or practitioners." But enough has been said with reference to the principles on this subject, which prevail in Virginia and West Virginia, to enable us without difficulty to decide this cause.

In the cause before us the bill asking for an injunction to prevent the vendor from collecting a judgment at law for the purchase-money makes no allegation, that the vendor had not a good title to every portion of the land conveyed and had not a good right to convey the same; all that it does allege is, that there were sundry judgments exceeding the value of the land conveyed, which were liens upon this land; but it does not allege, that there were not other lands greatly

exceeding in value the amount of all these judgments, which were first bound to pay these judgments before the land conveyed could be subjected to the payment of these judgments. And it could have made no such allegation, for the evidence shows, that the vendor owned lands greatly exceeding the value of the purchase-money of this land, which he still held when this deed for this land was made. There is no allegation, that the vendor was insolvent, or that any suit was brought or threatened to subject this land to the payment of these judgments, nor any single fact stated in the bill, that tended in any degree to show, that there was the least probability, that any suit would be brought to subject this land to any of these judgments; and the evidence shows, that there was not the least probability of it, and it shows indeed, that it was impossible that this land ever could be subjected to the payment of any of these judgments, there being lands liable to be first subjected greatly exceeding the value of these judgments. The was no allegation in the bill, that the vendor had practiced any fraud; that the vendee did not know, when he accepted this deed, of the existence of all these judgments, and that they were liens on this and all other lands of the vendor. So far from this being the case the very covenants in the deed show, that he had this knowledge, and that he could hardly help knowing it as the only judgments, which were liens on this land were recorded on the judgment-lien-docket in the county where the land lay.

The covenants were first a covenant of warranty, then a covenant that the vendor was seized in fee, and had a good title and right to convey the land, neither of which covenants is it pretended were broken, and lastly a covenant "that this land should not be subjected to any liability from incumbrances thereon." This on its face shows, that the vendor knew of these judgments, which were liens on this tract of land, and was content as a protection against them, that the vendor should covenant "that this land should not be subjected to any liability because of these judgments." The bill did not allege, that it had been so subjected or that it was threatened to be so subjected or that there was any probability or even possibility of its being so subjected; nor

could the bill truthfully have made any such allegations according to the evidence. There was therefore on the principles, which we have laid down, no pretense in this bill for asking an injunction to prevent the enforcement of the judgment for the purchase-money, and no such injunction should have been awarded. But it having been granted, the injunction should have been dissolved on September 17, 1881, when the defendants moved to dissolve it, and the court erred in the decree of September 17, 1881, especially as the answer of the defendant Arbogast had been filed, and depositions to sustain the same had been taken which showed, that, the bill could not be so amended as to save it from liability of dismissal on demurrer. The injunction should have been dissolved then and the bill dismissed at the plaintiff's costs.

The second motion to dissolve this injunction ought clearly to have been sustained by the court. It was made January 11, 1882, and when made, the plaintiff had taken no depositions to show, that it was possible to amend his bill and make it a good bill entitling him to any relief. The court however instead of dissolving the injunction and dismissing the bill at the plaintiff's costs improperly referred the cause to a commissioner to ascertain the liens existing and unsatisfied upon this tract of land, the amount and priority of these liens and to whom the same were due. The commissioner made his report, on the face of which it appeared, that it was materially erroneous. It reports in class No. 1 a judgment in favor of J. H. Kindig and Peter Wein against Jacob H. Arbogast for sixty-nine dollars and seventy-two cents debt, interest and costs, and in class No. 3 another judgment for two thousand two hundred and one dollars and thirty-six cents debt, interest and costs in favor of same parties, allowing no credit on these judgments; yet in a subsequent part of this report he states, that one thousand five hundred dollars had been paid on these judgments, and he refers to the deposition of R. F. Dennis filed in the papers of the cause for other credits and payments on these judgments. On examination of this deposition we find, that as counsel for the plaintiff in these judgments he had received one thousand five hundred dollars in cash upon them, and one

thousand three hundred dollars in bonds given to Jacob H. Arbogast for the purchase-money of other lands and secured by liens on these lands which bonds with the one thousand five hundred dollars in cash would more than pay off the whole of said two judgments; and these facts are also proved by the deposition of Jacob H. Arbogast. The only remaining judgment is the one in class No. 2 in favor of the defendant, Stalnaker, and to satisfy it Jacob H. Arbogast had transferred the bonds of the plaintiff, J. S. Wamsley, for this land, on which the judgment was rendered the collection of which was enjoined, and which would more than pay off the judgment in favor of Stalnaker by some three hundred dollars, all of which is fully proven in the deposition of Arbogast, and which is strongly confirmed by the fact, that the judgment enjoined was in the name of Jacob H. Arbogast for the use of Stalnaker. So that when the plaintiff satisfies this judgment, he will thereby at the same time relieve his land from the only lien upon it.

The final decree of September 30, 1882, is right, so far as it dissolves the injunction and dismisses the bill at the cost of the plaintiff, but is in all other respects erroneous. It should not have been heard on the report of the commissioner, as the cause should not have been referred to a commissioner, and therefore his report should not have been confirmed though not excepted to, and because it was grossly erroneous on its face. It attempted to ascertain the amount of the judgment, interest and damages due from the plaintiff on the judgment in favor of Arbogast for the use of Stalnaker and then rendered a decree against him therefor, but in so doing there were clerical errors made to a considerable extent. The calculation is made in paper X annexed to the decree. This calculation when correctly made is as follows:

"Judgment in favor of Jacob H. Arbogast use of Hamilton Stalnaker rendered may 15, 1880.................$1,765.37
Interest at 6 per cent. per annum from date of judgment to date of injunction-bond, October 7, 1880, 4 months and 22 days.....................................................     41.78
Add cost of common law suit.....................................     12 05

"$1,819.20

"Damages on $1,819.20 from October 7, 1880, date of in-
  junction-bond to the 30th day of September, 1882,
  date of the decree, at rate of 10 per cent. per annum
  (1 year, 11 months and 24 days).............. ...............$ 361.47
                                                            ―――――――――
                                                          "$2,180.67"

The interest on this should run from September 30,
1882, so that the decree should have been for two thousand
one hundred and eighty dollars and sixty-seven cents with
interest thereon from the 30th day of September, 1882, till
paid, but this was a clerical error, and when corrected this
part of the decree should be affirmed. But the next and all
the other errors in this decree are judicial errors and as to
them the decree should be set aside and reversed. The first
of these is the statement in this decree of the liens on this
tract of land, an error produced by omitting the credit of
one thousand five hundred dollars as shown on the face of
the commissioners's report on the two judgments in the first
and third class, and in truth there should equitably have been
a further credit on these judgments of one thousand three
hundred dollars, which amount in good bonds had been long
before placed in the hands of the counsel of the plaintiff to
be collected, and out of the proceeds these judgments were
to have been paid off, and doubtless they would have thus
been entirely paid off and so constituted no lien on this land.

The next error consisted in treating the debt in class No.
2 as a lien on this land; for when the plaintiff in this suit
paid the judgment, which he had improperly enjoined, this
payment at the same time satisfied this judgment in the sec-
ond class, as the claim against the plaintiff was assigned to
Hamilton Stalnaker for the express purpose of satisfying this
judgment in favor of Stalnaker named as constituting this
second class. There was therefore in fact no real lien on this
tract of land. If however there had been, the court would
still have erred in adjudging that Jacob S. Wamsley had a
right to have his purchase-money applied to extinguish these
liens.

The court again erred in directing, that the supposed right
of Wamsley should be preserved by directing Hamilton
Stalnaker, when he collected his judgment against Wamsley,
to apply the same to the payment of these supposed liens.

If there had been such liens, and if it had been proper that the money due from Wamsley on this land, evidenced by the judgment against him, should be applied to the extinguishment of such liens, it should have been done in some effectual manner, and not by directing Stalnaker to make the application; for he might never have made it, and for all we know he might have been insolvent, and it might have been out of the power of the court to enforce obedience to this order or direction.

The next provision, though badly worded, is right and should be affirmed. It in substance dissolves the injunction and dismisses the bill at the plaintiff's costs.

The last provision of this decree is erroneous and should be reversed. It provides, that if Wamsley did not pay off the debt, interest and costs decreed against him within ten days after the rising of the court, the clerk should issue a *fieri facias* for the amount directed to the sheriff of Randolph county endorsed, "no security to be taken." The law fixes the penalty to be imposed on a party on the dissolution of an injunction staying the collection of a judgment, and it is no part of this penalty that when the injunction is dissolved and a new execution awarded, the defendant shall not, if he chooses, give a forthcoming bond, when his property is levied upon. This direction to the clerk to endorse on this execution "*no security to be taken*" was not proper; nor was it proper to stay the issuing of this execution for ten days after the rising of the court.

My conclusion therefore is, that this final decree of September 30, 1882, so far as it dissolves the injunction granted and dismisses the bill at plaintiff's costs, and so far as it decrees the payment of an amount made up of the judgment enjoined including the costs of obtaining said judgment and interest on the same, till the injunction-bond was given at the rate of *six per cent. per annum*, and the damages on this aggregated sum at the rate of *ten per cent. per annum* till the date of this decree is correct; but as a direct error was committed in calculating the amount to be decreed, this error should be corrected, and thus corrected, this portion of said decree should be affirmed. In all other respects this decree should be set aside and annulled; and the appellees should

recover of the appellant their costs in this Court expended and damages according to law.

AFFIRMED IN PART AND REVERSED IN PART.