# CHARLESTON.

## KINPORTS *et al. v.* RAWSON *et al.*

### Submitted January 25, 1887.—Decided April 2, 1887.

\*(SNYDER, JUDGE, absent.)

1. ORDER—DECREE—VACATION.

   A court has no power to enter an order or decree in vacation, unless so authorized by statute.

2. VENDOR AND VENDEE—PURCHASE-MONEY—INJUNCTION.

   Equity will enjoin the collection of the purchase money on land on the ground of defect of title, after the vendee has taken possession under conveyance from the vendor with general warranty; if the title is questioned by a suit either prosecuted or threatened, or if the purchaser can show clearly, that the title is defective.

3. VENDOR AND VENDEE—INJUNCTION—QUIA TIMET.

   By the words—" if the title is questioned by suit either prosecuted or threatened " is not meant, that it is sufficient to allege in the bill, that a suit is threatened merely, but the bill on its face must allege the ground, upon which the threatened suit is based, which must be such, as will put a reasonable man in just apprehension of the loss of his land.

4. VENDOR AND VENDEE—INJUNCTION—QUIA TIMET.

   The mere fact, that some one has asserted a claim to the land, and that that fact is generally known in the community, where the land is situated, is insufficient to justify a court of equity in restraining a sale made under a trust-deed to secure the purchase-money of the land.

*R. S. Turk* for appellant.

*J. W. Harris* for appellee.

JOHNSON, PRESIDENT :

This is an injunction from the Circuit Court of Greenbrier county. The plaintiff, Porter Kinports, and the St. Lawrence Boom & Manufacturing Company on the 27th day of

---

\*A party to the suit.

April, 1886, filed their bill against W. L. Rawson, A. C. Snyder, trustee, Homer A. Holt and A. F. Matthews. The bill alleges the purchase by Kinports from Rawson on the 20th day of August, 1881, of a tract of 1,632 acres of land, also of 800 acres and an unexpired lease of 780 acres with the right to remove timber from the last mentioned tract. The contract of purchase is exhibited. The consideration for the land was $12,000.00, of which $3,000.00 was paid in cash, and three bonds of three thousand dollars each, payable to Rawson in one, two and three years respectively. The bill further alleges, that on the 3d of October, 1881, Kinports conveyed the whole of said land to A. C. Snyder, trustee, to secure the payment of said bonds;—that the property was purchased by Kinports for his co-plaintiffs, and said company has settled with him for the money, he has paid on the land, and assumed the payment of the residue of the purchase-money, and Kinports has conveyed the property to them;—that the last two purchase-money-bonds remain unpaid, and the trustee has under the trust advertised said land to be sold to pay the balance of said purchase-money.

The plaintiffs allege, that " there is a serious cloud upon the title of at least said tract of 1,632 acres of land, and that owing to that fact and the other facts herein stated the sale of said property as advertised would inevitably result, as the plaintiffs believe and charge, in a great sacrifice of said property and in the irremediable and great damage to the plaintiffs;"—that the said 1,632 acres of land constitute the most valuable portion of the property by them purchased, and more than $7,000.00 having been paid, the plaintiffs have no means of protection against the loss, which they will sustain, if such sale be made, or if they should pay the debt and lose the land by paramount title;—that Rawson was not in the actual possession of the land at the time of the sale, and neither of said plaintiffs has been put or is now in the actual possession thereof; but they claim and upon information allege, that at the time of the purchase of said land by said Rawson and of the conveyance of the same, his vendor and those, under whom he claimed, had held under color of title and under a grant from the Com-

monwealth of Virginia for more than fifteen years preced-
ing said purchase actual continuous adversary possession of
said land, and that said Rawson and the plaintiffs respect-
ively were invested by the conveyance to them respectively
with all the title to said land, which had been acquired or
was held by the grantors of said Rawson;—" that the said
H. A. Holt and A. F. Matthews claim to own said tract of
1,632 acres of land in fee under an older grant than that,
under which said Rawson and the plaintiffs claim, and have
asserted their claim to the representatives of the plaintiffs
and have threatened them with a suit therefor, and there is
now pending in the Circuit Court of said county of Pocahon-
tas, as they are informed believe and charge, another suit
brought by the vendors of said Holt and Mathews, and
which said Holt and Mathews are prosecuting, the object of
which is to recover of one White a considerable body of
land lying within the grant, under which said Holt and
Mathews claim said 1,632 acres of land ; "—that said Holt and
Mathews claim to have recently caused a survey to be made
of the exterior boundaries of their said grant and have in-
cluded therein the said 1,632 acres as well as the land
claimed in said suit against said White, and have exhibited
to the attorney of the plaintiff, what they claimed to be a
plat of said survey showing the above stated facts, and if
their paper-title is sufficient to cover the land of said White,
for which the suit aforesaid is now being prosecuted, as
plaintiffs are informed, it would be sufficient to cover said
1,632 acres. " *But whether of course said surveys are accu-
rate, or said title of Holt and Mathews is a valid one, the
plaintiffs do not know;* "—that these conflicting claims are
matters of wide notoriety in said county of Pocahontas and
said county of Greenbrier, where said lands are advertised
to be sold as aforesaid, and among those persons, who under
other circumstances would be likely to be bidders therefor;
that a sale under such circumstances would necessarily lead
to a sacrifice of said 1,632 acres and, as they believe and
charge, of all of the land mentioned in said trust-deed,
which might be sold thereunder by said trustee;—that the
lands were purchased for the timber, and they expected to
get them all, and they would lose greatly, if any part of the

land were lost to them;— that it is the duty of a court of
chancery to remove the cloud from the title, so that the
land would bring a fair price;—and that, until that is done,
a court of equity should enjoin the sale under the trust-
deed;—that Rawson has no property in this State and but
little anywhere else;—that if they were compelled to resort
to a suit on the warranty, it is doubtful, whether it would
avail to protect them.

The bill prays for an injunction to said sale, until by a de-
cree in the cause the said cloud on the title to the 1,632
acres should be removed, and that Holt and Mathews may
be required to produce their title to said land, that the title
thereto may be determined and quieted. The bill was sworn
to. The injunction was granted on the 3d day of July, 1885.

The defendant, Rawson, answered the bill and with his
answer exhibited a grant from the Commonwealth of Vir-
ginia issued on the 3d day of June, 1856, to May & Cleek
for the 1,632 acres of land and a conveyance for the same
by said May of his two thirds undivided interest executed on
the 10th day of June, 1881, and from the executor of Cleek
for said Cleek's undivided one third interest in said land,
dated on the 12th day of September, 1881. In this answer
he denies, that he was not in possession of said land, when
he sold to Kinports, and avers, that he had the actual and
uninterrupted possession of all said land, and especially of
said 1,632 acres, at the time he sold and conveyed it, and
that he and those, under whom he claimed, had had such
possession under a good and sufficient title for over twenty
years, as he is informed and verily believes;—that there were
houses, enclosures and improvements extending into it on
tracts adjoining the 1,632 acres belonging to Elijah May, one
of the respondent's grantors, which said houses were occupied
by said May's tenants, which facts were fully know to said Kin-
port's agents;—that the possession of said May was open and
notorious;—and that said Kinports was placed in the actual
possession thereof, and if he has not remained so, the fault is
not respondent's. He denies, that Holt and Mathews have
any valid or subsisting title to any part of said land;—or that
plaintiffs have ever been approached by said Holt and
Mathews, their agents or attorneys, with threats of suit or

assertions of any claims whatever;—or that there is any suit pending or other proceedings against respondent or the plaintiffs, in which this title is in any manner called in question by said Holt and Mathews or by any one else;—or that any notice to quit or any process has been served on plaintiffs;—or that respondent ever heard of any question in regard to the title, except through the St. Lawrence Boom and Manufacturing Company, its agents or attorneys.

He avers, that he knows nothing of any suit by the grantors of Holt and Mathews against one White pending in the Circuit Court of Pocahontas county or of the issue involved therein, and that the bill does not enlighten him as to who the grantors of Holt and Mathews are. He denies, that there were such conflicting claims to said land as to cause them to sell at a sacrifice at the time advertised, and avers that they have greatly appreciated in value, and that he is willing and has repeatedly offered to refund to said Kinports his money paid, if he will re-convey the land. He denies the charge, that he has no property in this State, and says, that he has property in this State of the value of at least $2,000.00, at Covington, Va., of the value of $4,500.00, at Richmond, Va., where he resides, of the value of $2,000.00, and at Newport News, Va., of the value of $1,000.00 and other assets amounting to at least $4,000.00. He denies the right of the St. Lawrence Boom and Manufacturing Company to proceed against him or to stay the collection of his debt against Kinports; and again denies the right of Kinports after having conveyed to the Boom Company with special warranty the property to enjoin the sale, no matter what the condition of the title. He avers, that the whole object of the suit was to delay and hinder him in the collection of his claims. He avers, that he has always acted toward said Kinports in the most open and frank manner, at his simple request, extending the time of payment on said bonds, as to one of them eighteen months and as to the other six months, and during all this time not one intimation was made as to any cloud on or defect in the title.

The plaintiffs took the depositions of John W. Harris, attorney for and also director of the Boom Company, E. H. Camp, the Vice President and Treasurer of said Company,

John Driscol, the President, and Porter Kinports, one of the plaintiffs, and also of Ben Hursthall.

John W. Harris testified to the substance of the bill, if it can be said to have any substance. He says, the 1,632 acres are claimed by Holt and Mathews; that they claim to be owners of said land by title superior to that of Rawson's; and that they had asserted to him as the representative of the Boom Company such claims; that they had exhibited to him, what purported to be a plat of the Swan survey of 17,000 acres of land, and pointed out to him the 1,632 acres as lying within said survey, *under which they claimed*, and showed him, that said 1,632 acres were laid down as lying within said survey; and the surveyor, who ran the lines and platted said land, had declared to him, that 1,632 acres were included within said survey;—that there was lately pending in the Circuit Court of Pocahontas county, where said lands lie, and still is pending, as deponent is informed by counsel therein, an action, which was brought by some of the vendors of said Holt and Mathews against one White, and said White has pointed out on said plat either the whole or a part of the land sought to be recovered of him as lying within said Swan survey as so platted and exhibited to him, the de- ponent; and it is a matter of common report and belief, that the paper-title asserted against said White is the same pa- per-title asserted to said 1,632 acres. He further says, that the fact, that Holt and Mathews assert a claim to the said 1,632 acres, is widely and extensively known in said county of Pocahontas and among lumber and timber men in Green- brier county.

On cross-examination the witness stated, that, when he first ascertained, that the 1,632 acres lay within the survey claimed by Holt and Mathews, he asked Holt, whether he intended to claim the land; that he replied in the affirma- tive, and " I gathered the idea of a threatened suit from this reply and my subsequent conversations with the par- ties. About the time however of the institution of this suit, in order to have the matter more clearly defined, I asked Capt. A. F. Mathews directly, if I could say, a suit was threatened; and he replied in the affirmative. They did not state the nature or kind of suit, they intended to insti-

tute, or the time they intended to bring it. He further said :—" There was nothing said to indicate offensive action other than, what I have just stated and the pendency of the White suit. They did not say, they intended to sue at once. *The conversations directed themselves principally to a compromise.* " He further said :—" Of my personal knowledge I can say nothing with regard to the accuracy of said surveys. I know nothing as to their accuracy. " He said he knew nothing as to the validity of the supposed title of Holt and Mathews,—said, he made a partial examination of their paper-title but not to such an extent as to enable him to say whether it was good or bad. He was asked the following question :—" With the number of paper-titles now floating over West Virginia lands, do you believe that a simple claim or threat to enforce his claim by any person owning such a paper-title would prove a serious barrier to any sale, which might be made of lands under a previously supposed good title; and do purchasers generally regard these paper-titles as matters of much importance ? " He answered :—" In answer to the first clause of the question I would say, it would depend altogether upon the circumstances of the particular case, especially upon the character of the paper-title and the value, quantity and location of the land proposed to be sold. As far as my knowledge as a lawyer extends, purchasers generally do regard these paper-titles as of importance ; and a prudent purchaser and a capable lawyer always look carefully to them ; but there are a great many, that will not stand the test of even a superficial examination. "

E. H. Camp in his deposition does not pretend to know anything about the claim of Holt and Mathews, but says, it was generally known, that they asserted a claim and would enjoin the sale of the land.

John Driscol's deposition is to the same effect. Porter Kinports in his deposition says, he purchased the land for his co-plaintiff;—*that to the best of his recollection* Rawson never made him a direct offer to refund his money, if he would re-convey the land ;—that from what he has heard of the cloud on the title without saying, what it was, he thinks it would seriously interfere with the sale of the land.

Ben Hursthall in his deposition says, it had been reported to him through different parties, that by a recent survey made by the order of Holt and Mathews the 1,632 acres of land were included in the survey, and that said claim was a matter of general notoriety in the counties of Pocahontas and Greenbrier;—that said claims would affect the sale. Elijah May, who owned two undivided thirds of the 1,632 acre tract and conveyed it to Rawson, shows, that there had been a continuous actual possession of a clearing on that land by him and his tenants until 1881, when he conveyed to Rawson. This is corroborated by other testimony in the record. Rawson in his deposition says, he never had any knowledge of any adverse claim to the land, until he called on Kinports for payment of the last two bonds, on one of which he had extended the time of payment for eighteen months and on the other for six months. He then received notice from Harris, attorney, that Holt and Mathews claimed to be owners of the land;—that Holt and Mathews have never spoken to him about such claim, and he says they have no superior title to it;—that he knows of no threatened suit;—that Clark and May had actual possession, when he purchased, and such possession, as he received, he gave to Kinports. He deposes to all the material matters set up in his answer.

The deposition of R. S. Turk, Esq., attorney for Rawson, was taken. He says: "I went to see Capt. Mathews at the request of my client, Rawson, to ascertain, what was the extent of the ' threatened ' suit mentioned in the bill. In that conversation Capt. Mathews told me, that he had never threatened suit; that Major Harris, counsel for the St. Lawrence Boom and Manufacturing Company, had applied to himself or Judge Holt, I am not positive which, to see the plat of a tract claimed by said Holt and Mathews as belonging to them covering the 1,632 acre tract; that at the request of John W. Harris said plat had been exhibited to him; but that Holt and Matthews had never threatened suit; on the other hand they claimed to be in possession of the land claimed by them, and any suit for it must be against them and not brought ~ by them; and I further drew from said conversation with Capt. Mathews, that himself and Judge

Holt had at no time or place ever approached the St. Lawrence Boom and Manufacturing Company, its agents or attorneys, or Kinports with any demand or threat whatever in relation to the 1,632 acre tract." He further said, that he knew of an ejectment-suit in Pocahontas county styled *S. A. Miller, trustee,* v. *Henry White and Seibert's heirs.* He was counsel for White. The suit, so far as he knew, did not involve the title to the 1,632 acres of land. That was compromised by Holt and Mathews, who are the purchasers, as he understands, of S. A. Miller, trustee, &c., by Holt and Mathews buying the interest of White and Seibert's heirs for $5,000.00, a price, which then would be regarded as high, if the title was of the best.

On the 13th day of January, 1886, in vacation the special judge selected to try the cause heard the cause on bill, answer of Rawson, general replication thereto, exhibits filed, depositions, and the motion of defendant, Rawson, to dissolve the injunction, upon consideration of which the said judge decided :—" It was the duty of the trustee in the deed of trust in the bill mentioned to take the proper steps to remove the cloud on the title, which in the opinion of said judge hangs over the property mentioned in the trust-deed before proceeding to execute said trust by making sale of said property; and that on his failure so to do any party injured has, and the plaintiffs in said bill have the right so to do ; and the said judge being further of opinion, that although in the present state of the case under the Act of the Legislature (Acts 1882, chap. 131, p. 341,) he has no power or authority to direct an issue in this cause to try the title to said lands, *and said title conveyed to the plaintiffs has not been shown to be clearly defective, and no suit to recover the same of them has been brought or threatened,* yet he is of opinion, that to sell the said land under the circumstances shown to exist and without the cloud on the title would result in the sacrifice of said property, which it is the duty of the court to prevent." The judge then continued said motion to dissolve until the next term of the Circuit Court of Greenbrier county and directed the said plaintiff, the said St. Lawrence Boom and Manufacturing Company, to bring an action of ejectment against said Holt and Mathews to try the title to said land.

On the 20th day of April, 1886, the attorneys for the respective parties agreed the fact to be, that said action in ejectment had been brought. On the 27th day of April, 1886, the cause was heard on papers formerly read, the agreed facts, and on motion of defendant, Rawson, to dissolve the injunction. On consideration whereof the court refused to dissolve the injunction, while the said action of ejectment is pending or undetermined, unless the plaintiff in said action should hereafter fail to prosecute the same to a final determination with proper diligence.

From the decree of the 13th of January, 1886, and that of the 27th of April, 1886, the defendant, Rawson, appealed.

It is properly conceded by counsel for the appellees, that the judge acted without authority in vacation in directing an action of ejectment to be brought by the plaintiff to test the validity of an adverse claim to the land. (*Monroe* v. *Bartlett*, 6 W. Va. 441; *Johnson* v. *Young*, 11 W. Va. 673.)

As to whether an injunction would under the circumstances of this cause lie to restrain the sale under the trust-deed I do not propose to review the Virginia authorities. This task has been accomplished by Judge Green in *Walmsley* v. *Stalnaker*, 24 W. Va. 214, where the conclusion was reached, that in this State equity will enjoin the collection of the purchase-money of land on the ground of defective title, after the vendee has taken possession under conveyance from the vendor with general-warranty, if the title is questioned by a suit either prosecuted or threatened, or if the purchaser can show clearly, that the title is *defective*. In this cause there certainly is no defect in the title shown. On the contrary the chain of title exhibited with the answer is complete from the Commonwealth to the defendant, Rawson, and the exhibit with the bill shows the deed from Rawson to Kinports. More than this the proof shows adverse possession of more than twenty years in Rawson and those, under whom he claimed; and this is substantially admitted in the bill. The special judge, who entered the order of January 13, 1886, in the order says: " and said title conveyed to the plaintiffs has not been shown to be clearly defective, and no suit to recover the same of them has been brought or threatened." This is true. The judge found correctly. It seems to me,

that the proof utterly fails to make out a case for the inter-position of a court of chancery. The bill, it seems to me, does not show a proper cause, and the proof is far below the allegations of the bill. If it had appeared, that a *bona fide* suit had been brought against Rawson's vendee to establish what was really believed to be a valid claim of superior title, and the court could see from the exhibition of such title, that there was indeed doubt about the title, or if under such circumstances a suit of such a character was threatened, then there would be grounds to enjoin the payment of the pur-chase-money; but it certainly never was intended by the judges, who have used the language,—" title questioned by suit either prosecuted or threatened," to be understood to mean, that, if an idle suit had been brought or threatened, when there was really ground for such suit or such threat, this would be sufficient to prevent an honest vendor from collecting his purchase-money by the enforcement of a judg-ment, deed of trust or otherwise. If there is a *bona fide* claim set up which is exhibited, so that the court can see it, and on such claim a suit is brought or threatened, that is sufficient; or if no such suit is brought or threatened, and yet the plaintiff can show clearly to the court, that the title of his vendor is defective, he is entitled to the protection of the court by injunction.

The judge in his decree of January 13, 1886, bases his ac-tion on *Lane* v. *Tidball*, Gilm. 130; *Rossett* v. *Fisher*, 11 Gratt. 499 and *Burlew* v. *Quarrier*, 16 W. Va. 118. In none of these cases were the trusts executed for the purchase-money but to secure the payment of other debts. In the case in Gilman a suit was pending affecting the title. In *Rossett* v. *Fisher* the legal title was outstanding; and in *Burlew* v. *Quarrier* the land had been sold for taxes, and there was a cloud on the title in the form of a tax-deed. Here there is nothing of the kind. From anything, that ap-pears in the evidence, there is nothing whatever in the claim of Holt and Mathews. If they have any *bona fide* claim to the 1,632 acres, it nowhere appears in the record. The most, that can be claimed, is, that Holt and Mathews claim, that they own a 17,500 acre survey, and that they caused it to be surveyed, and that the survey as thus laid down included

63

this 1,632 acres. The bill alleges, that they claimed the 1,632 acres under a grant from the Commonwealth older than the patent under which Rawson holds. Of this there is not the slightest proof; and whether they own the 17,500 acres survey is nowhere shown, and whether the 1,632 acres were included in that doubtful survey by mistake or otherwise is not at all apparent. The most, that can be said, is, that Holt and Mathews claim the 1,632 acres, and it has become generally known, that they claim it, and that the sale would be injured by such claim. Unfortunately there have been too many claimants for many tracts of land in this State; and if after an owner had sold his land and conveyed it with a covenant of general warranty and taken a deed of trust to secure the payment of the purchase-money, he could be enjoined from the execution of his trust by the fact, that some one set up a vague, indefinite claim on the land, when the injunction was dissolved upon the title being shown to be good, there would be no good reason, why he should not be enjoined a second or third time or just as often as any one might get a surveyor to include the land in a larger tract claimed by him without showing such claim; and thus the progress of the settlement of the country would be retarded, and great injury for no good reason be inflicted on vendors. It is true, equity will require a real cloud to be removed from the title to land before it will suffer the land to be sold under a trust; but it must be such a cloud, as reasonably and necessarily results in injury to the debtor, unless it be removed. But here is no cloud.

The decrees of January 13, 1886, and April 27, 1886, are reversed with costs, the injunction dissolved and the bill dismissed with costs.

REVERSED.