**CARTER COAL CO. v. LITZ et al.**

District Court, W. D. Virginia, at Roanoke.
April 30, 1943.

W. P. Hazlegrove, of Roanoke, Va., and Herbert J. Jacobi, of New York City, for plaintiff.

E. L. Hogsett, of Huntington, W. Va., for defendants.

PAUL, District Judge.

In 1939 A. Z. Litz and others were the owners or purported owners of lands in McDowell County, West Virginia, of an area of approximately 2,400 acres. The owners of the land and their respective undivided interests therein were A. Z. Litz, 17/48; Etta V. Litz, 4/48; J. N. Harman, Jr., 1/48; Mamie M. Sanders, 2/48; J. J. Sperry, 12/48; the estate of H. E. Harman (Cary H. Biggs and James W. Harman, executors), 12/48.

During the latter part of 1939, negotiations were initiated between A. Z. Litz and the Carter Coal Company for a sale to the latter of what are described as the underwater seams of coal on the 2,400 acres of land at a price of $75 per acre. Mr. Litz was the owner of the single largest share in the land. He apparently had more experience and knowledge of coal lands and of this tract in particular than any of his co-owners and the negotiations, including the correspondence relating to the proposal, were conducted between the Carter Company and him. There is no evidence that Litz held any power of attorney or any instrument constituting him agent for the other owners, but it is clear that the latter acquiesced in and approved of his conduct of the negotiations. However, Litz did not purport nor attempt to bind the other own-

ers and when the written offer of purchase was made by the Carter Company, all of the owners recorded their individual acceptances.

The original written offer of purchase was dated October 24, 1939, and was accepted conditionally. One of the conditions was the vendors would be able to secure a release from the Premier Pocahontas Collieries Company, to which the premises were then under lease; the other conditions related to the nature of the warranty of title to be given by the individual grantors and to certain terms of payment. These matters were satisfactorily settled and the parties came to a complete agreement as to the terms of sale, subject to examination and approval of the title to the land by the vendee; and it was agreed that the matter should be closed not later than June 30, 1940.

As a result of the examination of the title to the lands, the attorney employed by the vendee for that purpose reported that in his opinion the title was good as to a portion of the land, comprising 1,349 acres; but that as to the remainder of the land, 1,051 acres, there was a question as to the title arising as follows:

It appears that the 2,400 acres of land was made up of various separate tracts in which one W. L. Taylor had owned various undivided interests prior to the year 1924. In that year a creditors suit was instituted against Taylor under the style of Abraham P. Thompson et al. v. W. L. Taylor et al., as a result of which Taylor's interest in these lands, as well as other real estate owned by him, was decreed to be sold. At the sale, which was a public one under decree of court, A. Z. Litz had become the purchaser of Taylor's interests in all of the parcels going to make up the 2,400 acres. As a result of his examination of this link in the chain of title the attorney for Carter Coal Company was of opinion that, due to a misdescription of certain of the lands in the decree of sale in Thompson v. Taylor, A. Z. Litz had not acquired the entire interest of W. L. Taylor in 1,051 acres of the land but that as to this tract there was still outstanding a 750/1900 interest in the heirs of W. L. Taylor. Taylor had died in 1932.

In view of this question it was agreed that the vendors should undertake to procure from the Taylor heirs a quit claim deed to any interest they might have and apparently, in anticipation that this could be procured, the vendors under date of June 28, 1940, executed a deed to the 2,400 acres of land and the Carter Coal Company gave certain checks to the respective grantors for a cash payment on the property and executed certain notes for the balance, as well as a deed of trust securing the payment of the notes.

Negotiations with the Taylor heirs were then conducted both by personal interview and correspondence in an attempt to get a conveyance of the Taylor interests, but after several months it was found that this could not be done. The vendors and the vendee then had further discussions and as a result it was agreed that the deed of June 28, 1940, conveying the 2,400 acres and the attendant papers be cancelled and that the property be handled as two parcels and conveyed in separate deeds; but that as to the 1,051 acre tract the deed, the purchase money notes, and the deed of trust securing the notes should be placed in escrow for a period of not exceeding three years, during which the grantors should take steps to clear the title. The parties drafted a written agreement covering this and the other terms of the transaction. While neither this agreement nor the deeds executed in pursuance of it were in fact entered into or executed until sometime during the fall of 1940, the parties for purposes of their own agreed that the agreement and the deeds and other papers should all be dated as of June 28, 1940. Accordingly a deed, dated June 28, 1940, was executed by the grantors conveying the 1,349 acres, title to which was not in question, reciting the payment of $36,000 in cash with the balance of the consideration evidenced by notes payable to the several grantors in the amounts of their respective interests. These notes aggregated $65,175, bore interest at 5 per cent payable semiannually, and were payable in ten equal annual installments; their payment was secured by a deed of trust. At the same time there was executed a deed to the 1,051 acre tract reciting a consideration of $78,825, all of which was evidenced by notes payable to the several grantors in the amount of their respective interests. A deed of trust was executed by the grantee to secure payment of the notes and, pursuant to the agreement of the parties, these deeds, deed of trust and notes were delivered to a selected trustee to be held in escrow for a period not exceeding three years, the period agreed on for clearance of the title.

The agreement provided that, in case the title was not cleared within three years, the grantee might either extend the period or terminate the escrow, in which latter event the deed, deed of trust and notes were to be returned to their respective makers. The agreement made no specific provision as to how the failure to clear title to the 1,051 acre tract should affect the transaction as related to the 1,349 acres; but did provide that "except as specifically provided herein, this agreement shall not be construed as a release or waiver of * * * any of the interests, rights or claims of any of such parties as against any other or others of the parties, pursuant either to the contract of sale or to any other agreements, deeds * * * or other instruments, or otherwise, * * *".

Pursuant to the agreement to clear the title to the 1,051 acre tract a suit for this purpose was instituted on June 21, 1941, in the Circuit Court of McDowell County, West Virginia, under the style. of J. J. Sperry et al. v. Walter L. Taylor, Jr., et al. A. Z. Litz had died in November, 1940, and his heirs, together with the other vendors, were the plaintiffs in this suit and the vendee (Carter Coal Company) also joined as a plaintiff. The defendants were W. L. Taylor, Jr., Ryland Craft, Ann Craft, Bettie Craft and Ryland Craft, Jr. The first of these was a son of W. L. Taylor and the others were respectively the surviving husband and the three infant children of a deceased daughter of W. L. Taylor.

In their bill the plaintiffs set forth the nature of their title to the 1,051 acres, alleged themselves to be the sole owners thereof and prayed that certain old deeds through which the Taylors claimed an interest be declared void as a cloud upon the title. On September 2, 1941, the defendants filed an answer in which they not only claimed an interest in the 1,051 acres but in support thereof asserted matter which constituted a claim to an interest in the entire 2,400 acres. This claim was based on the following facts and assertions. As before stated, the sale in the creditors suit of Abraham P. Thompson et al. v. W. L. Taylor et al. had resulted in a sale of Taylor's undivided interests in various tracts which now make up the 2,400 acres involved in the instant case. At this sale A. Z. Litz became the purchaser of the Taylor interests in these lands for the sum

of $57,500. This sale was made at public auction, was confirmed by the court and a deed was made to Litz by J. N. Harman, Jr., and G. W. Howard, Special Commissioners, by deed dated May 1, 1925. In their answer in the suit of Sperry et al. v. W. L. Taylor, Jr., et al., the Taylors asserted that Litz's purchase at the sale in the old creditors suit had been in pursuance of a previous agreement between him and W. L. Taylor whereby Litz was to bid in the lands and obtain a deed therefor and reconvey the lands to Taylor's wife and children within the period of five years after the sale upon the payment to Litz of the sum of $86,250, against which latter sum Litz was to credit any amount received by him as rents or royalties from the land during the five years. The Taylors contended that as a result of this understanding the deed conveying the lands to Litz did not invest him with the fee simple absolute but that it was in legal effect "a mortgage or trust" with the right in the wife and children of W. L. Taylor to redeem the lands. It was further asserted that at the expiration of the five years a further agreement was entered into granting a further period of three years within which the Taylors might redeem the lands, but so modified as to apply to only a 60 per cent interest therein. It was further asserted that, prior to the expiration of the extended agreement, W. L. Taylor, Jr., had attempted to redeem the lands and had been prevented by the failure of Litz to furnish an accounting or statement of the amount necessary for such redemption. The answer, which was in the nature of a cross bill, prayed that the deed from Harman and Howard, Special Commissioners, to A. Z. Litz of May 1, 1925, be decreed to be a mortgage with a right of redemption in the defendants as to 60 per cent undivided interest in the lands conveyed thereby; and that the heirs of Litz be required to make an accounting of all rents and royalties received by him from the land and applicable to the debt which such mortgage secured.

Following the filing of the answer in the suit of Sperry et al. v. W. L. Taylor, Jr., et al., the Carter Coal Company, on September 25, 1941, notified the grantors not to negotiate any of the notes given in the purchase of the lands and, on October 6, 1941, sent to each of the grantors a notification that it (the Coal Company) had rescinded and disaffirmed its agreement to

purchase the 2,400 acres of land and all contracts executed in pursuance thereof. It tendered a reconveyance of the land and demanded the return to it of all amounts paid on the purchase price and of the notes evidencing the balance. The reasons given by the vendee for its rescission, as stated by it, were "material non-disclosures, material misrepresentations, material failures of consideration, and material breaches of contract"—presumably based upon the contents of the answer in the West Virginia suit.

On October 28, 1941, the demands of the vendee not having been complied with, it instituted the present action in this court. The complaint sets out the course of the transactions heretofore related and alleges that the vendors (defendants here) misrepresented that the title to the land was good and concealed the fact of the outstanding claim of the Taylors, that such claim was unknown to the vendee and by its concealment the vendee was induced to enter into a contract which it would not have done had it known of such claim; and that such claim was disclosed to it for the first time by the contents of the answer in the West Virginia suit. It does not assert that any damage has accrued to the vendee nor that its right to the possession or use of the land has been interfered with or questioned other than by the assertions of the Taylor heirs in their answer. The prayer of the complaint is (1) that the agreement for purchase of the 2,400 acres of land "be adjudged to have been rescinded"; that the defendants be required to redeliver to plaintiff the purchase money notes executed by it and the deeds of trusts securing the same; that the defendants be required to pay to the plaintiff all amounts paid by the latter in cash; and, in event any of the purchase money notes cannot be redelivered by reason of having been transferred to bona fide purchasers for value or for any other reason, that defendants be required to pay the amount thereof to the plaintiff; and that plaintiff have such other, further and different relief as may be proper.

On November 13, 1941, the defendants (vendors) filed their separate answers. While the general content of these answers is the same, that filed by the heirs of A. Z. Litz is the most pertinent inasmuch as he had been the active negotiator of the sale and it was to him that the charges of misrepresentation and concealment were more particularly directed. He himself had died after the agreement of sale had been entered into and before the bringing of the suit in West Virginia. The answer of his heirs asserted that there had been no representations by any of the grantors as to the title to the land or any part of it; that there was no misrepresentation or concealment and that the vendee at all times had as full knowledge and the same knowledge as the vendors as to the existence of any claims of interest; that neither A. Z. Litz or any of the vendors had knowledge of any claim by the Taylors affecting the 1,349 acre tract until the answer was filed in the West Virginia suit; that Litz had never had any such transactions with W. L. Taylor as those alleged in the answer and on which Taylor's claim was based nor any knowledge of any facts leading to a belief that such a claim would be made. It was further asserted that the deed to A. Z. Litz following his purchase of the W. L. Taylor lands at the judicial sale invested him with the fee simple title absolute and that any contention that it was intended as a mortgage or to create a trust, or that it did so, was without foundation or merit. It was admitted that Litz following his purchase had on May 1, 1925, executed an instrument giving to Ada Taylor, Cecil Taylor Craft and W. L. Taylor, Jr., the wife, daughter and son of W. L. Taylor, the right to purchase the lands within five years upon certain conditions; and that on April 17, 1930, this agreement was renewed for a period of three years as to a portion of the lands. But it was asserted that both of these instruments were merely options to purchase, neither of which was ever accepted or exercised and all rights under which had expired not later than April 16, 1933; and that these options gave no countenance or basis for a claim such as made by the Taylor heirs. The answers of the other vendors were of the same general tenor and also assert that they know nothing of any past transactions between A. Z. Litz and W. L. Taylor upon which the Taylors based their claim.

The vendors had on October 21, 1941, filed in the suit of Sperry et al. v. Taylor et al. their special reply to the answer and cross bill of the Taylors in that suit, in which reply they asserted the unfounded and spurious nature of the Taylors' claims on the same grounds and in substantially the same language as in their answers in the instant case. The issues thus raised in

the West Virginia suit as to the merits of the Taylor claim were pending and undetermined when the vendee instituted the instant action on October 28, 1941, and when the vendors answered in this case on November 13, 1941. On March 2, 1942, the heirs of A. Z. Litz asked leave to file a supplemental answer in the instant case and, over the opposition of plaintiff, leave was so granted. The supplemental answer set forth that since filing their original answer these defendants had compromised and settled all claims of the Taylor heirs to any part of the 2,400 acres of land and had obtained deeds releasing all claims of the Taylors; that the adults among the Taylor heirs had executed release deeds in their own right and that the interest of the infants had been conveyed by a special commissioner appointed by the West Virginia court after it had considered and approved the settlement. The defendants exhibited copies of these deeds and tendered a quit claim deed to the plaintiff to complete the latter's title. The plaintiff declined this and has pursued its remedies in the present action.

A fact to be borne in mind is that the claim as asserted by the Taylors was distinctly different from that noted by the title examiner. The latter related to an interest in part of the land amounting to 1,051 acres, due to failure of a decree of sale to describe correctly the amount of the interest ordered sold. This question was known to all the parties and the suit of Sperry v. Taylor had been instituted to correct it. The claim as asserted by the Taylors in their answer was to an equitable ownership of an undivided interest in the entire 2,400 acres. It was this claim that caused the plaintiff to disaffirm the contract on the ground that the existence of this claim had been concealed from it and that it had no knowledge of such a claim until it was set up in the answer in Sperry v. Taylor.

A second fact to be borne in mind is that the plaintiff announced its rescission and brought the instant suit without waiting for any determination by the West Virginia court of the merits of the Taylor claim.

As has been pointed out in the course of the foregoing recital, the claim asserted by the Taylors in their answer in Sperry v. Taylor rested on agreements evidenced by two written instruments dated May 1, 1925, and April 17, 1930, respectively. Because of the controversy over the nature of these papers, it is desirable that the pertinent part of their contents be recited in full. The writing dated May 1, 1925, recites, as preliminary, that on March 21, 1925, certain lands (which are described) were sold in the creditors suit of Thompson v. Taylor; that at such sale these lands had been purchased by A. Z. Litz for $57,500; that the sale had been confirmed by the court and that Litz would, upon payment of the purchase price, be entitled to a deed. The writing then proceeds:

"Now, therefore, this Optional Agreement, Witnesseth:

"That for and in consideration of the sum of One Dollar ($1.00), cash in hand paid, the receipt whereof is hereby acknowledged, and of the mutual stipulations, covenants and agreements hereinafter set out, the undersigned, A. Z. Litz and Etta V. Litz, his wife, do hereby give and grant unto Ada Taylor, Walter Lee Taylor, Jr. and Cecil Taylor Craft, all, either or any of them, the exclusive right to purchase from him all of the said six tracts of land hereinbefore described for the period of five (5) years from this date, upon the price, terms, stipulations, and agreements hereinafter set out.

"The said Ada Taylor, Walter Lee Taylor, Jr., and Cecil Taylor Craft, all, any, or either of them, shall upon the exercise of this option, if all, any or either of them desire to exercise the same, pay the said A. Z. Litz for the said six tracts of land the sum of $86,250.00, cash in hand upon the execution and delivery of an apt and proper deed, containing covenants of Special Warranty of title; the said Litz agreeing and binding himself to execute to the said Ada Taylor, Walter Lee Taylor, Jr., and Cecil Taylor Craft, all, any, or either of them, who exercises the said option and pays the said money, a deed with covenants of special warranty conveying all of the said tracts of land, when all of said money is so paid.

"It is distinctly understood and agreed that any amounts which the said Litz may receive during the said period of five years as rents or royalties from said land that the same shall go as a credit on the amount above specified, but without said Litz being liable for any interest thereon, in the event the said optionees, or any, or either of them shall exercise their rights under this option, but if none of said optionees desire to exercise their rights under this option and pay the said amount above specified,

then the said rents and royalties so received by the said Litz shall be his free from any claim of any kind or character whatsoever of either W. L. Taylor or of the optionees.

"The said A. Z. Litz agrees not to sell or incumber the said lands within the said period of five years without first obtaining permission of the said optionees and W. L. Taylor."

This instrument was signed by A. Z. Litz and his wife, Etta V. Litz.

On April 17, 1930, a second writing was executed which, after the same preliminary recitations as used in the instrument of May 1, 1925, continues:

"Whereas, by writing dated May 1, 1925, said A. Z. Litz granted unto the parties of the second part, all, either or any of them, the exclusive right to purchase from him all of the said six tracts of land hereinbefore described for the period of five years from May 1, 1925, upon the price, terms, stipulations and agreements therein set forth, to which option contract reference is here made; and,

"Whereas, the parties hereto have mutually agreed to cancel and annul said option contract of May 1, 1925, and in lieu thereof the said parties of the first part agree to execute to the parties of the second part a new option to purchase from the parties of the first part sixty percent of the property so purchased by said A. Z. Litz at said public sale and fully hereinbefore described:

"Now, therefore, in consideration of the premises and of one dollar and other valuable considerations in hand paid by the parties of the second part to the parties of the first part, receipt of which is acknowledged, the said A. Z. Litz and Etta V. Litz, his wife, do hereby give and grant unto Ada Taylor, Walter Lee Taylor, Junior, and Cecil Taylor Craft, all, either or any of them, the exclusive right to purchase from the parties of the first part sixty percent of the said properties so purchased by said A. Z. Litz at said public sale and hereinbefore described for the period of three years from this date upon the price, terms, stipulations and agreements hereinafter set out.

"The said Ada Taylor, Walter Lee Taylor, Junior, and Cecil Taylor Craft, all, either or any of them shall upon the exercise of this option, if all, either or any of them desire to exercise the same, pay the said A. Z. Litz for said sixty percent of the said properties so purchased by the said A. Z. Litz at said public sale and hereinbefore described, the sum of twenty four thousand two hundred and ninety eight dollars and twenty-nine cents ($24,-298.29), cash in hand upon the execution and delivery of an apt and proper deed containing covenants of special warranty of title; the said parties of the first part agreeing and binding themselves to execute to the said Ada Taylor, Walter Lee Taylor, Junior, and Cecil Taylor Craft, all, either or any of them who exercise the said option and pay the said money a deed, with covenants of special warranty conveying sixty percent of the said properties hereinbefore described when all of the said money is so paid.

"It is further understood and agreed between the parties hereto that in cancelling said original option of May 1, 1925, and executing this new option that the said A. Z. Litz has given to the parties of the second part credit on the original consideration of $86,250.00 for all rents and royalties accruing on said properties up to December 31, 1929; and it is further understood and agreed that sixty percent of any amounts which the said A. Z. Litz may receive during the said period of three years from this date, or until this option is accepted by the parties of the second part, all, either or any of them, if the same be accepted prior to the end of said three year period, as rents or royalties from said lands shall go as a credit on the said consideration of $24,-298.29 which credit shall be applied on said consideration of $24,298.29, as and when received by him, in event the said optionees, or any or either of them, shall exercise their rights under this option but if none of said parties desire to exercise their rights under this option and pay the said consideration of $24,298.29 above specified, then the said rents and royalties so received by the said A. Z. Litz shall be free from any claim of any kind or character whatsoever of either W. L. Taylor or of the optionees hereunder.

"It is further understood and agreed that said consideration of $24,298.29 shall bear interest at the rate of six percent per annum from May 1st, 1930, until paid, subject to any credits that may be applied thereon, as hereinbefore set out or otherwise.

"It is further understood and agreed that the said original option contract of May 1, 1925, is hereby cancelled and that this new option is executed in the place and lieu thereof.

"It is further understood and agreed as a part of the consideration for the execution of this new option that in event the optionees, all, either or any of them, accept the terms hereof within said period of three years from this date that in addition to the payment of said consideration of $24,298.29 above mentioned, with interest, as aforesaid, that they are also to pay to the said A. Z. Litz the balance that may be owing by W. L. Taylor to said A. Z. Litz on two notes which the said A. Z. Litz holds against the said W. L. Taylor, one being originally for $10,-000.00, and the other being originally for $1,000.00, but which two notes are subject to credits and adjustment of rents between the said A. Z. Litz and W. L. Taylor and Ada Taylor.

"The said parties of the first part agree not to sell or encumber the sixty percent of the lands herein optioned within the said period of three years from this date without first obtaining permission of the said optionees and W. L. Taylor."

This paper was signed by A. Z. Litz and his wife and by W. L. Taylor, Ada Taylor, W. L. Taylor, Jr., and Cecil T. Craft. Both of the papers were duly acknowledged but it appears that neither was ever recorded.

To summarize, the positions of the litigants may be stated as follows: The plaintiff contends that when it entered into the contract of purchase it knew nothing of the claim of the Taylors affecting title to the 2,400 acres of lands as later asserted by them and had no means of knowing of it. That A. Z. Litz concealed from the plaintiff his agreement with W. L. Taylor made at the time the latter's interests were sold in the creditors suit and on which the Taylor claims were based and that this concealment amounted to a material misrepresentation as to the title. That had the plaintiff known of any such claim, it would not have contracted to purchase the property and that when the claim of the Taylors first came to plaintiff's knowledge through the answer and cross bill filed in Sperry v. Taylor, the plaintiff promptly disaffirmed and rescinded the contract as it had a right to do; and that it now de-mands the return to it of the money and notes given for the purchase price and the deeds of trust securing the notes. It contends further that the plaintiff having on October 6, 1941, notified defendants of rescission of the contract, this right of rescission is not affected by the offer made by defendants, since the institution of this suit, to perfect the title through the quit claim deed from the Taylor heirs. It is contended also that the defendants have not, even now, perfected the title and that it is still seriously defective.

The defendants assert that at no time did they misrepresent the title to any part of the lands or conceal any material facts relative thereto. That there was no defect in the title to any part of the lands except the question raised by the title examiner as to 1,051 acres thereof which question was known to all parties and noted in their contract. That the further claims of the Taylors, as asserted in the answer in Sperry v. Taylor, were without merit in fact. That the instruments dated May 1, 1925, and April 17, 1930, were merely options and created no rights in the Taylors other than the right to purchase upon the terms and within the time set out in the options; and that these options had long since expired and constituted no cloud upon or claim adverse to the title of A. Z. Litz. That in fact the plaintiff knew of these options at the time of its purchase. That the assertion in the answer in Sperry v. Taylor that these instruments created "a mortgage or trust" was the first that defendants ever knew of such a claim and that plaintiff had seized upon this spurious claim in an unjustified effort to escape from its contract. And that, in any event, the defendants have now acquired any and all interests which the Taylors had or might have had and have tendered a perfected title to plaintiff; and that the plaintiff has no ground for rescission.

### Discussion

At the outset it is required that there be determined the nature of this proceeding. This seems necessary because of the earnest insistence of the plaintiff that it is not a suit for rescission; that (to use its own words), "the rescission has already occurred and the Coal Company is here asking for relief upon the basis of a fully executed rescission". Just what is the purpose of insistence on this contention or what result advantageous to

plaintiff's position is thought to flow therefrom has not been made clear to the court. Apparently the view is that a vendee in a sale has a right to rescind at anytime and demand the return of the purchase price, subject only to a showing by the vendor that the rescission was unjustified, as to which showing the vendor has the burden of proof. The theory seems further to be that when the vendee disaffirms the contract and unsuccessfully demands return of the purchase price, the ensuing action is necessarily one at law and not in equity.

It is undoubtedly true, as plaintiff points out, that where one has purchased property on the inducement of fraudulent representations, there are several remedies that may be open to him. If he has paid the purchase price he may sue for its recovery. Or if he has not paid the purchase price he may refuse to pay, abandon the property or refuse to take possession, and set up the fraud as a defense when sued. Or he may retain the property and sue the vendor for such damages as may have been incurred from the fraud. Or he may bring a suit in equity praying for a judicial recission of the contract and for all such other action as is necessary for full relief. But the choice of the course to be pursued is ordinarily one to be determined by the position in which the vendee finds himself and what steps he thinks necessary to afford him relief. If he merely desires to recover a judgment for the purchase price already paid or for damages occasioned by the fraud, an action at law for a money judgment is appropriate. Weigel v. Cook, 237 N.Y. 136, 142 N.E. 444. If however he desires other remedies, not within the purview of an action at law, such as a decree rescinding the contract and ordering the cancellation of instruments of conveyance and the return to him of notes or other obligations of debt, his remedy is in equity, which alone has power to grant such relief. Bruner & McCoach v. Miller, 59 W.Va. 36, 52 S.E. 995, 999. But, as pointed out in Newberry v. Ruffin, 102 Va. 73, 78, 45 S.E. 733, 734, these are merely different "modes of redress" applicable to particular cases. And see Riverside Residence Co. v. Husted, 109 Va. 688, 691, 64 S.E. 958. The mode of redress invoked by a plaintiff is that applicable to the particular redress which he seeks and raises the procedural question of whether he may sue at law or must go into equity. Its choice is of importance in those jurisdictions which maintain the distinction between courts of law and courts of equity and which deny relief in a suit in equity if adequate relief can be obtained at law. And it will be found that practically all the cases in which the courts have discussed the variety of remedies open to a plaintiff in such cases as this and the distinction between such remedies arose in jurisdictions where the distinction between procedure in law and in equity is maintained; and that the question before the court was whether the plaintiff had sought the proper forum as determined by the nature of the relief sought. But in none of the cases, or elsewhere, do I find that the mode of redress invoked by a plaintiff alters the essential nature of his case so far as its merits are concerned or relieves him of the duty of proving the facts which justify him in refusing to abide by his contract. "Rescission, whether the object of a suit in equity or forming the basis of an action at law, is governed by equitable principles." 17 C.J.S., Contracts, § 413, p. 899. Unless the parties have contracted as to the grounds on which a contract may be rescinded or have acquiesced in a rescission, the mere announcement by one of them that he rescinds invests him with no different status than if he resorts to court to effectuate his rights.

"As a contract is made by the joint will of two parties, it can be rescinded only by the joint will of the two parties. It is obvious that one of the parties can no more rescind the contract, without the other's express or implied assent, than he alone can make it." 12 Am.Jur. 1011. And see Chicago, etc., R. R. v. Nebraska, 170 U. S. 57, 72, 18 S.Ct. 513, 42 L.Ed. 948.

Therefore the insistence of the plaintiff that this is not a suit for rescission but is an action for relief on the basis of "a fully executed rescission" seems rather meaningless. It is to all effects and purposes a suit in equity for rescission of a contract and for relief incidental thereto obtainable only in equity. The prayer of the complaint is that the contract "be adjudged to have been rescinded" and that the court order "the redelivery to the plaintiff of the * * * deeds of trust * * * and of * * * the promissory notes" executed by plaintiff; that the defendants be enjoined, pendente

lite, from transferring the notes in any form and for such further relief as may be proper. These remedies are peculiarly equitable ones. The Rules of Civil Procedure in the federal courts have abolished the procedural distinctions between law and equity by providing for one form of action in all civil cases, Rule 2, Rules of Civil Procedure; and have largely discarded the terms "at law" or "in equity" as legal nomenclature. But they have not abolished or discarded the principles of equity, nor their application in appropriate cases. Rule 1, while providing for uniformity of procedure in all civil suits, recognizes the distinction in the nature of such suits. The same applies to the various forms of procedure known familiarly as "Code Pleading". As said in Philpott v. Superior Court, 1 Cal.2d 512, 36 P.2d 635, 636, 95 A.L.R. 990, 992:

"The Legislature, in providing that 'there shall be but one form of civil action,' cannot be supposed to have intended at one fell stroke, to abolish all distinction between law and equity, as to actions. * * * The innovation extends only to the form of action and the pleadings, while the technicalities of pleading have been dispensed with; * * *. So cases legal and equitable have not been consolidated; and though there is no difference in the form of a bill in chancery, and a common law declaration, under our system, where all relief is sought in the same way from the same tribunal, the distinction between law and equity is as naked and broad as ever."

In a discussion of the Rules of Civil Procedure in 30 Ill.Law Rev. p. 445, the situation is well summed up in these words:

"In developing one form of civil action it is well to bear in mind that whatever else may have been abolished, actions at law and suits in equity still remain, not, it is true, as independent systems of procedure, but within a system which provides for both."

In an excellent opinion by Judge Yankwich, in the case of Wenzel & Henoch Const. Co. v. Metropolitan Water Dist., D.C.Cal., 18 F.Supp. 616, discussing jurisdiction as between law and equity in suits involving fraud, it is said in part (18 F. Supp. at page 620):

· "But whether a cause of action is legal or equitable does not depend upon the form adopted, or the name which the pleader may have given to it. It depends upon the facts pleaded or the remedy sought. If the facts pleaded are such that their determination depends upon the application of the principles of equity, jurisprudence, the action is equitable. If the remedy sought calls for the exercise of the powers which only a chancellor can exercise, the cause of action is, likewise, equitable. [Citing various cases.] Behind these principles is the fundamental fact that law and equity are dissimilar. The dissimilarity lies in the substantive rights which they administer. Even the reformed code procedure, which has abolished the distinction between actions at law and suits in equity and allows remedies both legal and equitable to be administered in the same forum and in the same action, has not abolished the substantive distinction between law and equity."

Measured by these standards, or by any others, the instant case is one in equity and its solution is dependent upon whether, in the application of the principles of equity, the plaintiff is entitled to the relief sought.

The evidence presented in this case, both by oral testimony and exhibits, is voluminous and no effort can be made to refer to all of it in detail. Likewise the arguments of counsel have covered a wide range of legal questions, extended consideration of all of which will not be necessary to a determination of the case. In the end the questions of determining importance, as conceded by the plaintiff, are:

I. Whether the claim by the Taylors to an interest in the entire 2,400 acres as asserted by them in their answer in Sperry v. Taylor was of such substance as to raise a material question as to the title.

II. Whether the Carter Coal Company had knowledge of the Taylor claims prior to closing the contract with defendants in October, 1940.

III. The effect on plaintiff's rights of the purported perfection of the title subsequent to institution of the suit.

IV. Whether any defects in the title were in fact cured by the settlement which the grantors effected with the Taylors.

I. The whole case of the plaintiff rests upon the merit of its contention as to the nature of the title which A. Z. Litz acquired when he purchased the W. L. Taylor interest in these lands at the judicial sale on March 21, 1925, in the suit of

Thompson v. Taylor; which, in turn, involves the conditions under which Litz purchased the Taylor interest and the terms of any understanding or agreement between him and the Taylors as to the conditions under which Litz acquired or held title.

■ The plaintiff has devoted much discussion to what it terms the "Taylor-Litz transactions" out of which it advances various contentions most of which the court is forced to conclude, after a diligent study of the record, rest only upon the imagination of counsel. It is first argued that the purchase by Litz at the judicial sale was the result of a scheme between him and W. L. Taylor whereby the property was to be purchased at an inadequate price, constituting a fraud upon the creditors of W. L. Taylor and upon the court under whose decree the land was sold. I can find nothing whatever to justify such an assumption. On the contrary, so far as the record shows, the creditors suit and all steps taken in the course of it were regularly conducted in every respect. There is no denial that the property was sold at a public sale after due advertisement; that the sale was publicly attended and that Litz became the purchaser because he was the highest bidder; that the special commissioners of sale recommended confirmation of the sale as a fair one and that the court confirmed the sale; that the purchase money for this land, as well as that for other tracts sold at the same time to other parties, was paid in full and regularly distributed to the creditors in accordance with the court's decrees. In the light of this it is impossible to see how any fraud was perpetrated on the creditors of W. L. Taylor or how they could possibly have any further claims against the land even though its proceeds may not have been sufficient to pay their debts in full.

The fact, even if it be a fact, that Litz became a bidder for the property at the suggestion or request of Taylor does not alter the situation. Neither Taylor nor Litz controlled the sale or the amount of the purchase price, except as Litz was willing to pay more for it than any other bidder. Neither is there any implication of fraud in the fact that Litz may have agreed before the sale that in case he became the purchaser he would give the Taylor family an opportunity to buy the land from him at some future time. As a matter of fact, there is no evidence to show that any agreement affording the Taylors an opportunity to repurchase the land was made until after the sale to Litz had been made and confirmed by the court. But even had such an understanding existed prior to the time that Litz bid on the property that fact alone would not make the situation any different. It is not unusual that a debtor, seeing his property sold by court decree, requests some more affluent relative or friend to purchase the property with the purpose in mind that the debtor may continue to occupy or use the premises through rental or that the debtor, if his fortunes should so mend as to permit it, might at some future time have an opportunity to reacquire title to the property by purchase. In the realm of kinship and friendship such incidents are common and furnish no foundation for a charge of fraud. The court ordering a sale and the creditors whose suit has required it are interested only in seeing that the sale is publicly and fairly conducted and realizes the highest obtainable sum; and there is no evidence that these conditions did not obtain here.

So far as the record shows, the only agreement between A. Z. Litz and W. L. Taylor or members of the Taylor family relating to Litz's purchase of the property is that set out in the instrument dated May 1, 1925, and the later modification of April 17, 1930. It is evident from all the circumstances, and there is no evidence to the contrary, that these instruments were born out of the hope of W. L. Taylor that he might so recoup his fortunes as to become financially able to reacquire his interest in these lands for the benefit of himself or of his family. To the fulfillment of this hope A. Z. Litz was willing to contribute by giving him the opportunity to purchase. The designation of Taylor's wife and children as the optionees was, no doubt, due to the existence of unsatisfied judgments against W. L. Taylor which would have made it inadvisable to take title to himself.

■ I can find nothing to indicate that the instruments in question are anything more than what they purport on their face to be, namely, options to purchase within a limited time and upon named conditions. The paper of May 1, 1925, does nothing more than give the right to the Taylor family to purchase at any time within five years the entire undivided interest of W.

L. Taylor which had been sold. There is nothing in the conditions of purchase which in itself affects the nature of the instrument. Options to purchase may, like other contracts, contain any conditions the parties choose to agree on. The advance in price at which the option was given was not unnatural when it is considered that it was an exclusive option for an extended period of time. The condition that any rents or royalties during the five years should be credited on the purchase price would appear to indicate merely that Litz was willing to accord the Taylors every reasonable help in their effort to acquire the property and to an understanding that the removal of coal from the land would result in a depreciation of its value of which the royalties for the coal would furnish a measure. I say that this *appears* to be true because there is nothing in the evidence to indicate the contrary.

The Taylors did not exercise their right to purchase under the instrument of May 1, 1925, and shortly before its expiration, on April 17, 1930, another instrument was drawn giving a new option to purchase for a further period of three years from the last named date, upon modified conditions. The last paper granted the Taylors the right to buy sixty per cent of the original Taylor interest and it fixed a new price based on the lesser interest and on amounts theretofore received by Litz from royalties. And it further provided that the optionees, in consideration of having been granted the new option, should, if they decided to exercise their rights under it, pay Litz a debt owing him by W. L. Taylor in the amount of $11,000. In other words, the paper of April 17, 1930, is plainly an extension of the rights granted in the first option made applicable to a sixty per cent interest and reciting the fact that the extension is granted on the consideration that if the option was exercised the optionees would pay the optionor an outstanding debt due the latter.

In its efforts to show the nature and intent of the transactions between A. Z. Litz and W. L. Taylor, the plaintiff relies on the testimony of W. L. Taylor, Jr., and to a lesser extent on that of Ryland Craft, these being the son and son-in-law respectively of W. L. Taylor. It appears however that neither of these men had any personal knowledge of the conditions under which Mr. Litz purchased at the judicial sale or under which the option dated May 1, 1925, was given. Admittedly their statements were based entirely on what W. L. Taylor had told them at later times. This evidence was plainly inadmissible. Sect. 6209 of the Virginia Code, through which plaintiff seeks to sustain its admissibility, is not applicable. This and related sections of the code deal with the competency as a witness of one party to a contract where the other contracting party is incapable of testifying by reason of death or other cause. Under the Virginia Code of 1887, the surviving party was not competent to testify except under limited conditions; Code of 1887, Sect. 3346. Under the Code of 1919, the last named section was repealed and the incompetency thereby removed, but Section 6209 was newly enacted in the Code of 1919 to limit the probative effect of such testimony. See Revisors' Note to Code of 1919; and see Epes' Adm'r v. Hardaway, 135 Va. 80, 115 S.E. 712; Robertson's Ex'r v. Atlantic Coast Realty Co., 129 Va. 494, 106 S.E. 521. This statute makes no attempt to change the traditional objection to evidence which is purely hearsay, and which would be inadmissible under any circumstances. But even if the testimony of Taylor, Jr. and Craft as to what W. L. Taylor told them were admissible, an examination of it discloses nothing inconsistent with the recital of events heretofore given or contradictory of the conclusion that the instruments designated as options to purchase were anything more than that.

I am unable to find anything that justifies the contention that the purchase by Litz at the judicial sale and the subsequent options to the Taylors created a "mortgage" or "a trust"; and there is no indication that, prior to the sale of this land to the plaintiff, anyone ever so contended. This appears to be of recent origin and born out of the exigencies of this litigation. It was in the answer of the Taylors filed in the West Virginia suit of Sperry et al. v. Taylor in September, 1941, that it was first alleged that the deed to Litz following his purchase at the judicial sale in 1925 was "not an absolute conveyance but was in legal effect and meaning a mortgage or trust with the right in these defendants to redeem said lands * * *". No attempt was made to elaborate this general and indefinite statement by pointing out the nature of the trust or mortgage. The plaintiff here

has seized on this allegation and pressed it but with a similar lack of definiteness. There is nothing to show and it is not contended that Taylor owed Litz $86,250 or $57,500 or any other sum to which a mortgage would have been applicable. There is no contention that W. L. Taylor furnished any part of the purchase price at the judicial sale thereby creating a resulting trust in his favor. In fact there is no suggestion of any trust relationship other than that Litz, having agreed to give the Taylors an opportunity to reacquire the land, held title to it subject to this obligation. In this sense every option is a trust. And if this be deemed to create a trust, then it need only be pointed out that trusts are terminable by agreement of the parties and that these options terminated at times specifically provided in them.

To avoid this result the plaintiff contends that the Taylors sought to exercise their rights under the second option prior to its expiration but were prevented from doing so by the refusal of Litz to give them a statement or accounting of the amount necessary to be paid. Again I find no evidence fairly justifying such a belief.

Prior to the expiration of the first option Ryland Craft, the son-in-law of W. L. Taylor, made an attempt to interest some outside capitalist in furnishing the money to take up the option and to take a part interest in the property. Admittedly this effort failed and thereafter the second option was sought and granted. Nothing more seems to have been done until in April, 1933, a few days before the second option expired, when Mr. Craft and W. L. Taylor, Jr. (W. L. Taylor had died in 1932), went to see Mr. Litz at his home in Tazewell, Virginia. This visit was not for the definite purpose of taking up the option but to confer with Mr. Litz and to find out what amount would be required to take it up in order that they might make an election based on that knowledge. Mr. Craft says of the purpose of this visit that they "had in mind exercising the option if the property was not going to cost too much money", and "of course, in the settlement, if it ran higher than we thought the property was worth, we wouldn't have taken it". He says further: "We thought probably we would owe him about $12,000". Asked if he would have exercised the option if he had found that, instead of $12,000 the cost had been as much as $20,000, he stated: "We might have paid $20,000, but we would not have gone any further than that, because we didn't think as much of that property as we had before".

They obtained from Mr. Litz a statement of the royalties collected during the life of the option but he was unable to furnish them with a statement of the credits to which they believed themselves entitled on the W. L. Taylor notes which the optionees had agreed to pay in case they exercised the option. It was understood that the notes were subject to some credits from rents on a building in Welch, West Virginia, in which W. L. Taylor and Ada Taylor had at one time in previous years had an interest jointly with Litz. The rents for this building had been collected by an agent of the owners in Welch and Mr. Litz told Craft and Taylor, Jr., that the information would have to be obtained there. It was suggested that they go together to Welch, about sixty miles away, in an effort to obtain the information and they did so. Shortly after reaching Welch Mr. Litz left there on some other business and the other parties did not see Mr. Gray, the agent whom they had gone to see; but no reason appears why they did not do so. On the return to the home of Mr. Craft in Gate City, Va., he and Taylor, Jr., drove by Tazewell, the home of Mr. Litz, but found he had not returned there. Nothing more seems to have been done until on September 30, 1933, after the option had expired, Taylor, Jr., wrote to Mr. Litz a letter in which he mentions that he has never received a statement as to the rents on the Welch property, but suggests other plans by which the Taylors could acquire a minor interest in the land, pending the carrying out of which he suggests that a further extension be granted. This letter, so far as appears, was never answered and during the succeeding period of approximately seven years no effort was made to take up the option and nothing was done by or on behalf of the Taylors to assert any rights in the land or to indicate that they considered themselves to have any rights. It might be added that it appears from the testimony of Mr. Gray, the rental agent for the building in Welch, that he had furnished to W. L. Taylor in the latter's lifetime a statement of the rents on the building, this having been done in 1925 at or about

the time W. L. Taylor's interest in the building was sold in the creditors' suit. An interest in the building owned by Ada Taylor had been sold by her in March, 1926. It seems therefore that W. L. Taylor had full opportunity to know of the disposition of the rents on the property during the entire period when he and his wife owned any interest therein and that he obtained such information from the rental agent up to the time that his interest was terminated. It may be that these records were incomplete or not understandable or otherwise unsatisfactory but if so there is nothing to show that the task of straightening them out rested on one of the joint owners more than upon another.

The substance of the evidence on this phase of the case has been set out fully because it is upon these facts that there is rested the contention that the Taylors sought to exercise the option and were prevented from doing so by the refusal of A. Z. Litz to give an accounting of the amount necessary to do so.

As throwing further light upon this feature of the case, as well as upon the rights possessed by the Taylors and claimed by them at that time, the following may also be noted. On March 6, 1933, shortly before the last option expired, Mr. Craft had occasion to write to the First Huntington National Bank a letter saying in part:

"Wish to advise that we believe you do not correctly understand this contract between Mr. Litz and Mr. Taylor and Mrs. Taylor. The contract is an option given by Mr. Litz to W. L. Taylor, Jr., Mrs. Ada Taylor and Cecil Taylor Craft whereby they can purchase, if they so desire, an interest in the lands now leased to the Premier Coal Co. Mrs. Taylor is ill and Mrs. Craft is dead and it is by no means certain that we will want to exercise this option."

The letter states that while "we will in all probability want to buy this property", the purchase is dependent on certain information which they have so far been unable to secure. On the same date Mr. Craft wrote to Mr. Litz, in part as follows:

"We have been unable to secure very much information about the Premier Company and do not yet know whether we want to buy this property or not. We are also uncertain about the amount of credit we are entitled to on a settlement between you and Mr. Taylor for rents etc. * * *

If the information about the Premier Company is satisfactory we will in all probability want to exercise this option or make you a payment and request an extension of time on the balance of it.

"If you will secure information as to just how much is owing the Taylors I will be glad to come to Tazewell and go over this matter with you. I am asking you to get this information since you were associated with them in this project and you can easily get information about it that it would take me a lot of time and money to get."

The statements quoted are plainly not consistent with any "trust" or "mortgage" theory, nor are they consistent with any contention that the Taylors had a fixed and definite intention of exercising their rights under the option and failed to do so only because they were prevented by Mr. Litz. On the contrary, they show that Mr. Craft, the spokesman for the family, understood that what they had was only an option to purchase and that the exercise of the option was dependent on what the property would cost. It shows also that Mr. Craft asked Mr. Litz to obtain the information necessary to calculate the purchase price merely because he thought the latter could obtain it more readily than Mr. Craft could.

Instead of trying to prevent the exercise of the option it would appear that the attitude of Mr. Litz was to the contrary. At the interview at Tazewell he furnished Mr. Craft and Mr. Taylor with a statement of the royalties from the Premier Coal Company and suggested where they might obtain the other data which he was unable to furnish. It is admitted that he advised Mr. Craft and Taylor, Jr., to exercise the option because the property was "too valuable to let go", and that he granted a thirty-day extension of their rights.

On the other hand, it appeared that the royalties from the Premier Coal Company, the lessee of the land, had fallen off between 1930 and 1933 and it was apparent that in any event the sum necessary to be paid on an exercise of the option would have been substantially more than the $12,000 which Mr. Craft had estimated before getting a statement of the royalties. As a result of Mr. Craft's inquiries he had been led to believe that the lessee was in financial difficulties. The general business depression was at its worst and the condition of the coal business and its future prospects were both very gloomy and according to

Mr. Craft's own statement he "didn't think as much of that property as we had before". It would seem that these were very probably the reasons why no real effort was made to exercise the option and account for the indifferent efforts to obtain an exact statement of the amount required to be paid. Every indication is that any intention to exercise the option was abandoned because the optionees did not believe the property worth what it would have cost. This conclusion is strengthened by the fact that shortly after the option expired Mr. Litz sold an interest in the land to H. E. Harman and that the Taylors knew of this sale as early as August, 1933. Yet at that time they raised no question of the right of Litz to sell nor did they assert any interest in the land or show any concern over any alleged rights until seven years thereafter and after plaintiff had purchased the land. Their indifference to the sale to Harman would indicate their belief that their only rights were under the option and expired with the option. It is clearly inconsistent with the "trust" or "mortgage" theory now pressed by the plaintiff.

This emphasizes the statement heretofore made that the "trust" or "mortgage" theory emanates from the pressure of this litigation and the suit of Sperry v. Taylor, rather than from the actual nature of these transactions even as understood by the Taylors themselves. During all the years until this litigation they referred always to their right as an "option to purchase". Even in his testimony in the present case Mr. Craft states that he considered the instrument of April 17, 1930, as being only an option to purchase and that the only rights of the Taylors were those set out in the instrument. W. L. Taylor, Jr., testifies that it was not until July, 1940, that he conceived the idea that the instrument in question constituted a mortgage; that this was after he had been approached about a quit-claim deed to the 1,051 acre tract; that he then began "running down the law" and construed the writings of May 1, 1925, and April 17, 1930, as constituting a mortgage. He admits that he never called to Mr. Litz's attention this construction of the papers and that, so far as he knew, Mr. Litz never heard of such a construction being placed on the instruments. It should be noted that W. L. Taylor was a practicing attorney and that W. L. Taylor, Jr., is also an attorney and, therefore, presumably capable of knowing the legal effect of their transactions; which makes it strange that for a period of fifteen years neither of them suggested that these papers were anything other than options to purchase.

■ The contract did not impose upon Litz the obligation to furnish the Taylors the amount of any credits on the $11,000 debt as a condition precedent to a decision whether they would exercise the option. Ordinarily when a debtor claims to be entitled to credits on a debt against him in a fixed amount, the burden is on him to show the credits to which he is entitled and he cannot impose this burden upon the creditor, at least in the absence of a showing that the creditor has exclusive knowledge of the information and that the debtor has no other means of obtaining it; neither of which conditions obtain here. Furthermore there will be noted that the option, referring to the $11,000 debt, provides that "in the event the optionees * * * accept the terms hereof within said period of three years" they shall, in addition to the recited consideration of $24,298.29, also pay the balance owing on the $11,000 notes. The obligation to pay this balance did not arise unless and until the optionees had accepted the option; nor was there any duty or need to ascertain the balance until the option was accepted. It is admitted that the Taylors never notified Litz that they were accepting the option. In this connection the defendants cite the case of Kenyon v. Suburban Realty Corp., 244 Mass. 571, 139 N.E. 172, 173, which seems directly in point. In that case, the defendant had given plaintiff an option to purchase certain real estate "at a price which shall pay to them (the optionor) the entire cost, taxes and interest as represented by their books * * *". The plaintiff alleged that he had repeatedly asked an officer of the optionor corporation for the figures but had not been furnished them. Admitting that he had never indicated an acceptance of the option, the plaintiff contended that the contract impliedly required the optionor to furnish the information from its books which would enable the plaintiff to exercise intelligently the rights granted him under the option and that the refusal of the optionor to furnish the information was a repudiation of the contract which excused the plaintiff from declaring his election to accept the option. The court denied these contentions and held that the contract imposed no obligation on the optionor to furnish the optionee the figures to enable the

latter to make a choice whether he would accept the option or not; and says: "In the absence of notice from the plaintiff to the defendant that he had elected to accept the offer at a price named or to be ascertained from the books no contract of purchase and sale ever came into existence." A similar case, with practically identical facts and a similar holding, is that of Stokes v. Carpenter, 166 App.Div. 441, 151 N.Y.S. 1000, affirmed in 218 N.Y. 705, 113 N.E. 1067.

If the instruments of May 1, 1925, and April 17, 1930, were merely options to purchase—and I am unable to construe them as being anything more—and if the optionor fulfilled his obligations under them, then all rights of the Taylors under the options, or in any way growing out of them, expired in May, 1933, at the expiration of the last thirty-day oral extension. Thereafter they constituted no basis for a claim to any rights in the land which A. Z. Litz was under the duty of disclosing to a prospective purchaser or which he had any occasion to disclose.

■■■■ The plaintiff here treated the claim of the Taylors as set up in Sperry v. Taylor as raising a question to its title justifying rescission of its purchase. It acted upon the mere assertion of the claim, without waiting for the West Virginia court to pass upon the merits of the claim. When it took this course, it necessarily assumed the burden of showing that the Taylor claim constituted a genuine defect in the title or one which portended real danger to its use and enjoyment of the property. For the first essential to the relief sought is that there is in fact a defective title. Max Meadows Land & Improvement Co. v. Brady, 92 Va. 71, 83, 22 S.E. 845. In this proof the plaintiff has failed.

■■■■ The mere fact that someone has asserted a vague and indefinite claim to the land either in court or out of it is not sufficient. Anyone can bring a suit and the courts frequently have before them claims of one sort or another found to exist only in the imagination or distorted judgment of those asserting them. Wamsley v. Stalnaker, 24 W.Va. 214, and Kinports v. Rawson, 29 W.Va. 487, 2 S.E. 85, 90, were cases in which it was sought to enjoin collection of the purchase price of land on the ground that the title was defective. The first of these cases held that such relief might be granted where it was shown that the title was questioned by a suit either prosecuted

or threatened or if the purchaser can show clearly that the title is defective. In Kinports v. Rawson the principle was approved but emphasis is laid on the fact that the objection to the title must be a real one; the court saying, in part, "* * * but it certainly never was intended * * * that if an idle suit had been brought or threatened, when there really was no ground for such a suit or such a threat, that this would be sufficient to prevent an honest vendor from collecting his purchase money * * *".

■■■■ If contracts for the sale of land could be avoided merely because some third person were to assert some right in the land, vendees would have a ready avenue of escape from unprofitable purchases by instigating the assertion of frivolous or spurious claims by unscrupulous or misguided persons. The danger of this was noted in Kinports v. Rawson, supra, where the court pointed out that if a vendor could be enjoined from collecting his purchase money merely "by some one setting up a vague, indefinite claim on the land", then upon dissolution of the injunction, the vendee could obtain other injunctions as often as someone could be found to assert a claim. And as said in Meeks v. Garner, 93 Ala. 17, 8 So. 378, 379, 11 L.R.A. 196, 198: "A vendor cannot be held responsible for a fraudulent misrepresentation as to his title, simply because third parties engage in blackmailing or malicious litigation with his vendee * * *."

■■■■ The plaintiff argues that the fact that the suit of Sperry v. Taylor was settled by the payment to the Taylors of the sum of $12,000 indicates that the claim of the latter was not a frivolous one. This ignores the fact that that suit was brought to clear the title to the 1,051 acre tract, as to which there was admittedly a question known to all the parties; and it may well be that the amount paid the Taylors was based on this claim alone. It is true that the compromise was "of all matters in controversy", but the petition filed by Ryland G. Craft, as guardian for his infant children, in which he asked the court to approve the compromise is illuminating in this respect. In referring to the matters in controversy, as raised by the pleading, he sets forth at length the facts as to the claim to the 1,051 acres and asserts his rights thereunder. Such mention as is made of the claim which plaintiff relies on in the instant case is quite brief and in such lan-

guage as to amount practically to an admission that it is without merit. In fact, the petition merely recites the giving by Litz of the option of May 1, 1925, which "was never accepted"; the giving of the second option of April 17, 1930, which "was never accepted" and which "expired by its terms on April 17, 1933". The petition refers to these papers as options giving "the right to purchase" and further says "So far as your petitioner knows or is advised, said options are the only agreements ever made respecting said lands between A. Z. Litz and Walter L. Taylor, Sr.," or any of the Taylors. It appears, therefore, that what was being settled between the parties was the claim to the 1,051 acres, and that the claim growing out of the options was in substance abandoned. If the Taylors' claim of equitable ownership in the entire acreage based on the "mortgage" or "trust" theory had been believed by them to have merit, they would hardly have settled for such a sum as they accepted and which sum appears to have been a fair settlement for their alleged interest in the 1,051 acres. Furthermore it is plain that a compromise settlement of a claim is not to be taken, in another suit, as proof of its merit.

The court being of opinion, and so finding, that there was no merit in the claim of the Taylors as to a right or interest in the land growing out of any agreement between A. Z. Litz and any of the Taylors, whether as embodied in the options of May 1, 1925, and April 17, 1930, or otherwise and that no defect in the title to the land has been shown, the plaintiff's suit is without foundation. The existence of a defective title is the first essential to maintenance of the suit and in the absence of such defect there would ordinarily be no need to discuss the other questions raised.

However these other questions have been argued at length, and earnestly, and because of the large interests involved in the case and its possible future course it seems desirable that this opinion should consider these subordinate questions also.

II. While these options were never recorded and, therefore, did not come to the knowledge of plaintiff in its examination of the record title to the lands, it is asserted by defendants that the plaintiff, through its attorney and otherwise, had actual knowledge of the options and their contents prior to the time the contract for the sale of the lands was finally concluded in October, 1940. This is denied by the plaintiff. Much evidence was introduced on this question by both parties which it is both impracticable and unnecessary to recite. It is in sharp conflict but I am of opinion that the weight of the evidence indicates that the plaintiff did know of the options prior to closing the contract. By this it is not meant to imply that plaintiff at that time knew the full extent of the contentions which the Taylors later asserted in their answer in Sperry v. Taylor. But neither did the defendants know of such a claim at that time. The reasonable inferences from the evidence are that both parties knew of the options but that both considered them merely for what they were, namely, options long since expired under which no rights any longer existed.

Under these circumstances there is no basis for a rescission on the ground of fraudulent misrepresentation or concealment on which plaintiff has grounded its claimed right of rescission. A vendor cannot be held responsible for a fraudulent concealment of a claim of which he has no knowledge. This, of course, does not mean that a vendee is without remedy except where a fraud has been perpetrated upon him. The fact that a vendor is ignorant of a defect in his title does not permit him to enforce his contract if in fact it developes that the title is defective. A vendee who has been promised a good title cannot be compelled to accept a bad one even though the vendor is ignorant of the defect when making the promise. In such case, if the contract be still executory, the general rule is that the vendee may rescind or disaffirm it and sue to recover anything he has paid. Ankeny v. Clark, 148 U.S. 345, 13 S.Ct. 617, 37 L.Ed. 475. But if the sale has been executed, it is generally held that the vendee's remedy must be on the warranty of title. Refeld v. Woodfolk, 22 How. 318, 327, 16 L.Ed. 370; Kimball v. West, 15 Wall. 377, 379, 21 L.Ed. 95; Max Meadows Land & Improvement Co. v. Brady, 92 Va. 71, 82, 22 S.E. 845; Thompson v. Jackson, 3 Rand., Va., 504, 15 Am. Dec. 721, 723. And see 27 R.C.L. 650.

And this would also apply even if the vendors had known of the Taylors' claim as it was finally asserted (which is not shown) but failed to disclose it in a sincere belief that it was frivolous and without merit. For there would not then have existed that element of fraud or bad faith essential to rescission in equity of

an executed contract, and on the allegation of which plaintiff depends in this suit.

"Where the application is to a court of equity to rescind an executed contract, it is laid down as a general rule admitting of few exceptions that to justify such a decree fraud must appear * * *." 27 R. C.L. 650.

■ As said in Max Meadows Land & Improvement Co. v. Brady, 92 Va. at page 83, 22 S.E. at page 849, in such a suit:

"The vendee must prove three things: [first] The defect; [second] knowledge and suppression by the vendor; [third] ignorance on the part of the vendee. And as to the second matter the scienter is essential." And see 50 A.L.R. 185, note. To justify rescission on the ground of fraud there must be an intention to deceive or mislead.

■ Therefore, even if there had been any defect in the title such as plaintiff alleges, there being no proof of fraud on the part of the vendors, the plaintiff's remedy would be limited to an action upon the warranty of title.

■ III. A further question argued by plaintiff is that the tender by defendants of a corrected title, since the institution of this suit, does not affect the plaintiff's rights. This is on the insistence that this is not a suit for rescission but that a rescission had been accomplished by the act of the plaintiff before suit was brought and the rights of the parties thereby determined—to which is added parenthetically, "assuming, of course, that the rescission was properly grounded in the first place". This question needs little discussion. In the first place it involves the nature of the suit which has already been discussed and which the court holds to be in effect a suit in equity for rescission of a contract and to which the principles of equity are applicable. It appears to be the general rule that, in a suit in equity for rescission of a contract for the sale of real estate on the ground of a defective title, the vendor may complete the title pending the suit and at any time before hearing; at least in the absence of fraud on the part of the vendor and where no damage has accrued to the vendee. Mays v. Swope, 8 Gratt. 46, 49 Va. 46; Clanton v. Burges, 17 N.C. 13; Westall v. Austin, 40 N.C. 1. This apparently is the rule in West Virginia. Mays v. Swope, supra, and see language of the court in Armstrong v. Maryland Coal

Co., 67 W.Va. 589, 69 S.E. 195, 204. In Kimball v. West, 15 Wall. 377, 379, 21 L. Ed. 95, the court sums up a situation such as exists here in these words:

"The plaintiffs had paid their money and accepted of the defendant his deed with a clause warranting the title. For any defect in that title the law gave them a remedy by an action on the covenant. But when, declining to pursue that remedy, they apply to a court of equity to rescind the whole contract * * * the necessity of such a decree to obtain the ends of justice must be very clear before it will be given. When, therefore, it appears that at the time of the hearing the defendant is able to remedy the supposed defect in his title, and in point of fact secures and makes good to the complainants, at his own cost, all that he conveyed to them originally, the complainants must show some loss, injury, or damage by the delay in perfecting the title before they can claim a rescission of the contract." .

■ Of course this question is immaterial if the court is correct in its previously expressed conclusion that there never was any defect in this title such as the plaintiff alleged; that there was no justification for an attempt to rescind in the first place and nothing for the defendants to make good. Nevertheless it would appear from the great weight of authority that even if the plaintiff had ever had a cause for complaint it is not under presently existing conditions entitled to the relief it seeks.

■ IV. But one other matter requires mention, namely, the contention of the plaintiff that the suit of Sperry v. Taylor which resulted in a compromise of the Taylor claim and quitclaim deeds of the Taylor interest did not effect a clearing of the title. It is contended that the interests of the infants (the Craft children) were not divested and continue to be a cloud on the title. The argument advanced is long and confusing but appears to be to the effect that the suit of Sperry v. Taylor was for the sole purpose of determining whether or not the Taylors had any interest in the land and that the power of the court was limited to that determination; that if it were determined that such interest existed, a separate and different suit was necessary to dispose of such interest. Apparently it is contended that infants' interests in lands can never be disposed of except through the medium of a

suit brought specifically for that purpose and of the nature ordinarily referred to as "a suit for the sale of infants' lands". No authority is cited for such a proposition and the court knows of none. Infants as well as adults may be parties to suits for partition, to remove clouds from title or other suits involving title to real estate. If the contention of the plaintiff were sound, there could never be, for example, a suit for partition of real estate where infants were part owners and where the property was not susceptible of partition in kind; for the court would be without power to effect partition through the traditional remedy of selling the property and dividing the proceeds. Contrary to such a theory, it has been clearly held in West Virginia, in Thompson v. Buffalo Land & Coal Co., 77 W.Va. 782, 88 S.E. 1040, 1042, that infants may be defendants in partition suits and that if the property is not susceptible of partition in kind the infancy offers no obstruction to a sale of the land in the partition suit. See also Eakin v. Hawkins, 52 W.Va. 124, 43 S.E. 211.

The suit of Sperry v. Taylor was brought to remove a cloud to the title of 1,051 acres of this land. The defendants in answer set up the claim here in question. The court thus had before it all matters relating to title to the land and all necessary parties. If during the pendency of the suit the parties agreed upon a settlement of their conflicting claims and the terms of their disposal, there appears no reason why this should not have been done. There is no rule of law which prohibits the settlement of legal controversies merely because infants may be interested, or which compels a court to go through the tedium and expense of determining rights as to which the parties themselves are in agreement. Where infants are involved, the courts are charged with the duty of seeing that they are properly represented and that their interests have not been sacrificed and that the agreement is to their advantage; but when this duty is performed the interests of an infant may be settled or compromised as well as that of any other litigant. In fact, there has been cited to the court a West Virginia statute (cited as Code 56-10-4) which specifically provides:

"In any action or suit wherein an infant or insane person is a party, the court in which the same is pending, or the judge thereof in vacation, shall have the power to approve and confirm a compromise of the matters in controversy on behalf of such infant or insane person, if such compromise shall be deemed to be to the best interest of the infant or insane person. * * *"

The statute further prescribes the manner in which application for approval of the compromise shall be made and the duty of the court in connection therewith; and examination of the record in Sperry v. Taylor indicates that the prescribed procedure was closely followed in that case. There is a similar statute in Virginia, Code, Sect. 5332. Independently of this statute it was held in Virginia, as long ago as 1823, that a court of equity has power to approve and confirm a sale of an infant's interests in land made or agreed upon before suit was brought; and this even though the suit primarily involved other purposes. See Garland v. Loving, 1 Rand., Va., 396. And see Smith v. White, 107 Va. 616, 59 S.E. 480. In conformity with this long recognized rule the Virginia statute dealing with the sale of infants' lands, Chap. 217, Va.Code, is construed as not requiring an independent bill for that purpose but as permitting such sale on petition filed in any appropriate suit already pending. See note to Sect. 5340 Va.Code 1942.

It was at the insistence of plaintiff that the suit of Sperry v. Taylor was instituted to clear title to the 1,051 acres and the plaintiff itself was a plaintiff in that suit. It must have known that if the court had found that the Taylors had an undivided interest in the land, there was no way in which this interest could be acquired and the title perfected except by a voluntary sale thereof by the Taylors. The court could have done nothing more than to partition the land and set aside to the Taylors the latter's interest. The court could not have compelled the Taylors to sell and certainly the vendors could not have maintained a separate suit to sell the infants' interest. The plaintiff, therefore, is in the insincere position of having been a plaintiff in a suit whose purpose was to give it good title to the land that it had purchased and now insisting that it was impossible in that suit to accomplish that very purpose. But even if there were merit in the contention that the title is still defective, plaintiff would have no standing to complain at this time. It was the question as to the 1,051 acres which formed the basis of the settlement in Sperry v. Taylor. Certainly that is true for the pur-

poses of the instant case, for this court has held that no other defect in the title existed. By the very terms of the contract the vendors were given a period of three years within which to clear the title to the 1,051 acres, which time has not yet expired. Even if the vendors had not yet cleared the title the vendee could not yet complain. However, this is pointed out merely in passing and it is desired to make clear that the court entertains no doubt that the proceedings in Sperry v. Taylor resulted in clearing all reasonable question as to this title.

### Conclusion.

The foregoing conclusions make it unnecessary to discuss questions of minor importance suggested in the course of the suit and which neither party have pressed in argument.

After consideration of the extensive evidence in this case and of the thorough discussion by counsel of the legal principles involved, I am compelled to the feeling that in no aspect of the case does any consideration of equity, either in the legal or the lay conception of the term, lie with the plaintiff. The land here in question was purchased by the plaintiff with the expectation of future development at such time as mining operations conducted by plaintiff on adjacent land owned by it would be extended to this land. At the time of purchase it was not expected that mining operations would reach this land for from three to five years thereafter. Meanwhile the land was conveyed and the plaintiff placed in possession. No interference with that possession has taken place; and there has been, of course, no interference with plaintiff's mining operations which, even in the absence of this dispute, would not yet have reached this land. The imaginative and unsupported allegations of the Taylors in their answer in Sperry v. Taylor constituted the only suggestion of any question of the title and this was not accompanied by any attempt to interfere with plaintiff's possession. The plaintiff has suffered no damage whatever and, so far as the title was in question, the defendants have perfected it before the plaintiff was prepared to or intended to make use of the land. There is no threat to plaintiff's use of the property whenever it shall be prepared to use it and the court can see no reason for relieving the plaintiff from its contract. The complaint will be dismissed with costs in favor of the defendants.